


**SO ORDERED.**
**SIGNED this 9th day of February, 2021**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

/s/ Shelley D. Rucker
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

**In re:**

**River City Resort, Inc.,**

    **Debtor.**

No. 1:14-bk-10745-SDR

Chapter 7

_____

**James L. Henry,**

    **Plaintiff,**

v.

**Emma P. Casey and B. Allen Casey,**

    **Defendants;**

**Jerrold D. Farinash,**

    **Intervenor-Defendant.**

Adv. No. 1:18-ap-01029-SDR

## MEMORANDUM AND ORDER

    This motion for summary judgment seeks a determination that a lengthy delay in the collection of a debt is sufficient to create an implied partnership between a creditor—plaintiff James Henry ("Henry")—and his delinquent debtor. If such delay can create an implied

partnership, Mr. Farinash, the intervenor and counter-complainant (the "Trustee"), argues that he is entitled to an inference in his favor that would leave an issue for trial. The Trustee argues the admittedly undisputed facts should lead the Court to deny the motion for summary judgment because those facts would allow the Court to infer that there must have been an implied partnership because any other explanation for Henry's conduct is "inconceivable." (Doc. No. 152 at 11.) However, the Court cannot find a legal basis on which to draw such an inference where no evidence of the existence of an understanding between the implied partners to share profits has been provided. The inference the Trustee asks the Court to draw is based solely on his argument which is not supported by the undisputed facts in this case or by analogy to cases in which other courts have found implied partnerships. The Court finds no legal or factual support for the Trustee's position; and the Court, therefore, grants Henry's motion for summary judgment.

The Court has previously found that it has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(N) and (O). (Doc. No. 85 at 2.) After reviewing the record and all the motion papers, the Court has decided that it has sufficient information available to resolve the pending motion without the need for oral argument.

**Undisputed Facts**

By way of background, the debtor, headed by Allen Casey ("Allen"), attempted to develop a resort in Chattanooga, Tennessee, on the Tennessee River. The resort was to be located on a barge which the debtor had purchased and planned to renovate into a hotel facility. The debtor and some affiliates and related entities amassed several tracts of land adjacent to where the barge was moored. Over more than a decade, multiple parties provided funding to the debtor, including Allen's wife Emma Casey ("Emma") and his children. The characterization of

that funding—and in some cases, its repayment—was a central issue in multiple lawsuits that ensued when the resort development stalled. *In re River City Resort, Inc.*, No. 1:14-bk-10745-SDR (the "Main Case"), Statement of Financial Affairs, Doc. No. 89. The Trustee's involvement in this proceeding is detailed in the Court's memorandum allowing the Trustee to intervene in this matter. (Doc. No. 78.)

The undisputed facts relevant to this motion follow. Henry is an attorney licensed to practice law since 1976. (Doc. No. 136 at 2.) He represented the debtor and its predecessor entities from approximately 1991 to the filing of the petition in 2014. (*Id.*) His fee agreement was to be paid his hourly rate plus interest on unpaid balances. (*Id.*) In 2003, Henry was paid $471,000 for fees plus other sums. In 2008, Henry was paid $35,000 following the sale of a portion of the debtor's property. (*Id.* at 3–4.) Henry billed the debtor monthly until about 2011. The debtor had begun accruing charges for legal services that Henry performed and billed from time to time.

The trustee provided six billing statements for the period after Mr. Henry ceased billing monthly. The first bill, dated April 22, 2011, totaled $182,728.32. (Doc. No. 152 at 16–26.) The April 2011 bill contained line items for services such as legal research; drafting of legal documents; legal analysis and advice; preparation of discovery responses for state-court litigation involving the debtor; and settlement negotiations. The April 2011 bill also contained line items for conferences about "business matters"; discussions about purchase offers; drafting of documents for "River projects"; and property inspection and review. Henry provided 256.3 hours of services at the rate of $250 an hour. The bill included $6,404.48 for finance charges.

A second bill dated April 18, 2012 totaled $132,246.37 (*id.* at 27–48) for fees and expenses; this bill contained similar line items including references to calculating membership

3

note percentages; extensions of offers to purchase; reviews of loan status and loan requests; and reviews of dockets from ongoing cases in state court. Henry provided 381 hours of legal services at the rate of $325 an hour. This bill also included finance charges of $32,620.76.

A third bill dated July 6, 2012 totaled $15,963.81 (*id.* at 49–55); this bill contained line items like the ones cited above plus references to preparing wills; drafting powers of attorney; and reviewing both joint venture proposals and alternative project financing. In this bill, Henry provided 46.4 hours of legal services at the rate of $325 an hour. Finance charges of $13,541.94 were added to the outstanding balance for services.

Substantially similar line items appeared in the fourth bill dated December 31, 2012, totaling $60,283.63 (*id.* at 56–66). Henry provided 166.7 hours of legal services at the rate of $350 an hour during this period. Additional finance charges of $33,102.25 were added to the outstanding balance for services.

The fifth bill dated January 8, 2014 totaled $534,669.49 for fees and expenses (*id.* at 67–104). This bill covered approximately 13 months. During this period Henry provided 1,205.9 hours of legal services at the rate of $395 an hour. This bill also reflects the addition of $86,270.22 in finance charges. During this period, the debtor was involved in several lawsuits with its other investors and creditors that were approaching trials from a review of the time entries.

The sixth bill and final bill for the prepetition period is dated February 19, 2014. It seeks fees and expenses totaling $101,730.03 plus a finance charge of $22,605.99 (*id.* at 105–12). The line items in the legal bills are consistent with prior billings related to corporate and litigation work and the language in the fourth amended complaint that Henry "cooperated with Allen

4

Casey" (Doc. No. 64 at 2, 8) in helping to execute some of the debtor's real-estate transactions. None of the statements shows any credits for payments on the past due balances. The debtor does not appear to have paid Henry for any of his billings from 2008 until 2014.

On February 24, 2014, the debtor filed its bankruptcy petition. On February 26, 2014, Allen also filed a bankruptcy petition. *In re Beverly Allen Casey*, Case No. 1:14-bk-10778. Allen's Chapter 7 case was a no-asset case. It was ultimately dismissed for failure to pay the filing fee on April 17, 2018, after the Trustee was unable to secure enough assets to pay even the filing fee. *Id.* (Doc. No. 148.) Henry filed amended Claim 16 in the debtor's case on June 30, 2014. He asserted a secured claim for attorney fees, costs, and interest totaling $1,232,069.07.

In 2011, Henry obtained a promissory note signed by the debtor, The Cornerstone of River City Resort, LLC (an affiliate of the debtor), and Allen for an amount that corresponded to the balance due on the April 11, 2011 billing statement. The note is dated April 11, 2011, but the signatures for the debtor and Allen are dated August 23, 2011. The promissory note contained language that the signatories would pay Henry "the sum of One Hundred Eighty-Two Thousand Seven Hundred Twenty Eight and 32/100 Dollars ($182,728.32) or so much as may be advanced from time to time payable upon demand together with interest at eighteen percent (18%) per annum." (Main Case Claim 16-2 Part 3 at 1.) The promissory note contained additional language that, at Henry's option, the note would become payable immediately if either the debtor or Allen filed for bankruptcy. (*Id.* at 1–2.) The note obligation was secured by a pledge of three lots of the debtor's real property and the barge that Allen planned to turn into a floating resort. The security interest was evidenced by a deed of trust executed on August 23, 2011, and recorded in the Register's Office of Hamilton County Tennessee at Book 9554, Page 195 on January 12, 2012. (Main Case Claim 16, Parts 3 and 4.)

5

Henry never discussed the possibility of any form of partnership with Emma and Allen and never had a written or oral arrangement to provide legal services in exchange for a share of profits. (Doc. No. 136 at 2–3.) Henry never advanced money to the debtor or managed the debtor's day-to-day affairs. (*Id.* at 3.) Henry always maintained his own bank accounts and never discounted his fees for the sake of the debtor. Henry concedes that he "sacrificed" when, after April 2011, he logged approximately 1,441 hours of legal services without being paid. (*Id.* at 4.)[1] Henry apparently focused so much on the debtor that he "had to borrow money to keep his law firm afloat during 2013–petition date due to the effort he made to save RCR [the debtor]." (*Id.*)

**Procedural History**

Following the bankruptcy filings, several significant events occurred in the case. The first was the removal and disposition of the barge. (Main Case Doc. Nos. 219, 245.) The second was a compromise by the Trustee of the estate's claims involving recharacterization of alleged debts held by Emma and other insiders of Allen as equity. (*Id.* Doc. Nos. 374, 393.) The third was the sale of the real property with liens attaching to the proceeds. (*Id.* Doc. Nos. 425, 438.) Henry did oppose the compromise but not the sale. (*Id.* Doc. No. 378 (objection).) He believed he had another course for recovery of his debt and commenced this case by filing his original complaint in state court on July 13, 2018. The original defendants, family members who had been part of the settlement with the Trustee, removed the case to this Court on August 13, 2018. (Doc. No. 1.) Since then, many of the original defendants have been dismissed, and Henry has filed several amendments. The fourth amended complaint (Doc. No. 64) currently is the

---

[1] While the exact number of hours will not affect the Court's analysis, the Court notes that Henry's legal bills between April 22, 2011 and February 19, 2014 show a total of 2,292.4 hours. (Doc. No. 152 at 25, 47, 53, 64, 102, 110.)

operative complaint.  The fourth amended complaint named three defendants, as follows: "B. ALLEN CASEY, individually, and d/b/a ALLEN AND EMMA PARTNERSHIP with EMMA P. CASEY."  (Doc. No. 64 at 1.)  Allen is no longer a defendant.  Henry currently makes claims against Emma and an alleged entity called the "Allen and Emma Partnership" on liability theories related to breach of contract, assumption of liability, and the equitable remedy of a constructive trust.

Henry's decision to name Emma as a defendant prompted the involvement of the Trustee here.  As part of her settlement with the Trustee, Emma transferred any rights or claims that she had against Henry to the Trustee.  When the Trustee realized that Henry's claims implicated both Emma and the debtor's estate, he moved for permission to intervene.  (Doc. No. 3.)  The Court granted the motion on January 7, 2019.  (Doc. No. 52.)  The Trustee, upon intervening, filed a counterclaim on July 12, 2019.  (Doc. No. 89.)  In the counterclaim, the Trustee asserted that Henry stopped receiving payment from the debtor for legal bills and never received payment on the promissory note that the debtor and Allen signed.  Considering (in the Trustee's view) Henry's intimate inside knowledge of the debtor's financial health, the Trustee cites Henry's acquiescence to non-payment to be "evidence that Henry only stood to profit from the work if the [debtor] became profitable." (*Id.* at 5.)  The counterclaim culminated in a single count alleging that Henry was an implied partner of Emma and the debtor.  Further, rather than be entitled to collect his debt or receive any sale proceeds, Henry should be held responsible for half of the debtor's debts.  According to the Trustee's counterclaim,

> The work Jim Henry performed on behalf of the Debtor and Mr. Casey, in essence, consisted of capital contributions to the company.  Other than the occasional promissory note, or deed of trust executed, he was not being paid regularly for his hourly expenses for legal services.  Henry had not taken steps to record the deed of trust and did not attempt to foreclose on the deeds of trust.

7

> At all relevant times, herein, Henry performed services with the intent of keeping the business viable in the hopes that it would eventually turn a profit. Henry was aware that he would never recoup any of his time invested in the company unless the business became profitable.

(*Id.* at 6.) The Trustee seeks a judgment against Henry equal to the unpaid balance of Emma's claims.

Henry filed the pending motion on October 8, 2020. In support of the motion, Henry has filed a declaration that his legal work for the debtor did not establish a partnership, either expressed or implied. He is, and was, a creditor of the estate for his legal services. The closest that Henry ever came to a business relationship with Emma and Allen was a discussion about a joint credit bid for some of the debtor's properties after the debtor filed its bankruptcy petition. (*Id.* at 5.)

The debtor's schedules prepared by Allen do not indicate the existence of any partnership or association. (Doc. No. 136 at 6 ¶ 51.) The schedules were signed by Allen under penalty of perjury. (*Id.* ¶ 52.) Schedule D lists Henry as a secured creditor for $1,215,762.81 with no indication of that the claim was contingent, unliquidated, or disputed. (Main Case Sch. D at 1, Doc. No. 84.)

## DISCUSSION

### *Summary Judgment Generally*

Federal Bankruptcy Rule 7056 incorporates Federal Civil Rule 56. The standard for summary judgment under Rule 56 is well known. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect

8

the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that there is an absence of evidence to support the nonmoving party's case. When the moving party has carried forward this burden, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008) (internal quotation marks and citations omitted). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Id.* (citation omitted). "Moreover, when the facts are undisputed and adopted by both parties, one of the parties is entitled to judgment as a matter of law." *Voss Steel Employees Union v. Voss Steel Corp.*, 16 F.3d 1223 (6th Cir. 1994) (internal quotation and editorial marks and citation omitted).

*Implied Partnership Generally*

Assessing the pending motion requires a review of the substantive law governing implied partnerships under Tennessee law. "'Partnership' means an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit formed under § 61-1-202, predecessor law, or comparable law of another jurisdiction." Tenn. Code Ann. § 61-1-101(7) (West 2010). A partnership agreement can be written, oral, or implied. *Id.* § 61-1-

9

101(8). "In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. If the parties' business brings them within the scope of a joint business undertaking for mutual profit—that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them—the result is a partnership whether or not the parties understood that it would be so." *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991) (citations omitted). In contrast to express partnerships, where a written or oral agreement definitively establishes the intent to create the partnership, an implied partnership is fact-sensitive and does not require any intent to create the partnership *per se*:

> Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

*Id.* (citations omitted).

Proving the existence of an implied partnership requires clear and convincing evidence. *See Tidwell v. Walden*, 330 S.W.2d 317, 319 (Tenn. 1959); *accord Montgomery v. Montgomery*, 181 S.W.3d 720, 726 (Tenn. Ct. App. 2005) (citations omitted).

In this case, the Trustee has the burden of proving the existence of the implied partnership by clear and convincing evidence. Henry, as the moving party, has come forward with his declaration that he had no understanding with Allen individually or as the principal of the debtor to share profits. His intent was to provide legal services and to be paid an hourly rate

for those services. To support that position, he has also stated that acted consistently with his agreement to provide services and, if not paid, to charge a finance charge. He took a deed of trust to secure his debt. The billing records provided by the trustee support Henry's contentions about having only a debtor-creditor relationship with the debtor and Allen. The Court finds that Henry has shown that there is "an absence of evidence to support the [Trustee's] case." *Baxter Healthcare*, 533 F.3d at 390 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The Trustee did not contest any of Henry's factual assertions about his unpaid legal bills or about the absence of any oral or written arrangement with Emma and Allen that would constitute a partnership. Instead, the Trustee relies extensively on *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991), to argue that the members of an implied partnership do not have to have any consciousness of the partnership itself, as long as they "combine their money, assets, labor, or skill with the understanding that there will be profits shared between them." (Doc. No. 152 at 9.) Even under the Trustee's authority that there can be an implied partnership when the parties are not even conscious that they have created a partnership, there must still be an understanding between the individuals that they are going to share profits. The Trustee has provided no evidence of such an understanding. The project has been so troubled that there have been no profits to share. The Trustee cannot point to an incident where profits were, in fact, shared, as occurred many times over the years with the couple that started and built a business in the *Bass* case. Even if there had been profits made and they had been transferred to Henry, Tennessee law does not create implied partnerships where profits are paid to another on account of a debt or for payment of wages. *Wyatt v. Brown*, 281 S.W.2d 64, 66 (Tenn. Ct. App. 1955).

The Trustee places heavy emphasis on Henry's statements about "sacrificing" for the debtor to provide this missing evidence:

> Based upon Mr. Henry's Declaration, it appears that he went "unpaid" for his skills and labor to save the assets of the Debtor from December 2003 to the present, save $35,000.00 sometime in 2008. The time that Mr. Henry devoted to the Debtor was when it had no operations. Its major asset was undeveloped, non-income producing land. Mr. Henry, under penalty of perjury, stated that efforts on behalf of the Debtor were, "harmful to me personally, as I was a sole practitioner and had to borrow money to pay law firm and living expenses during that time." That statement, in and of itself, proves that the efforts of Mr. Henry on behalf of the Debtor were more than the efforts of an attorney on behalf of their client.

(*Id.*) The Trustee continues that "by contributing 1,441 hours to 'protect' the assets of the Debtor over approximately a year for an entity that had no operations, no cash flow, no hope of paying him other than through an ultimate sale of real estate, Mr. Henry became a partner because his labor and skill on behalf of the Debtor required a profit in order for him to have any hope of being paid a return on the investment of his time." (*Id.* at 10.)[2] The Trustee does not provide any authority for his position that financial harm caused by a delinquent debt without anything else creates an understanding between two parties that they will share profits. Nor does he provide testimony from any other person that contradicts Henry's declaration that his involvement was limited to providing services.

The Trustee concludes that Henry's efforts for the debtor must have elevated him to the status of an implied partner because they run so contrary to the Trustee's law-firm experience:

> Although Mr. Henry has indicated that his intent was not to be partners with the Debtor, if he was suffering personal financial losses due to his near exclusive work for the Debtor, why continue that work if he was not protecting his personal financial interest in the Debtor? It is probably subject to Judicial Notice that lawyers allow clients to get behind in their payments to them. But, a sole practitioner would be even more unlikely to allow a client to put them in such a financial position as the Debtor put Mr. Henry in, if there was not something for the lawyer beyond the normal payment of his/her hourly rate. As stated in

---

[2] The Trustee here appears to be citing the assertion in the Statement of Undisputed Facts that Henry "worked approximately 1,441 hours on [the debtor's] affairs from April 2001 to [the] petition date." (Doc. No. 136 at 4.) As noted in the previous footnote, Henry's legal bills between April 22, 2011 and February 19, 2014 show a total of 2,292.4 hours. (Doc. No. 152 at 25, 47, 53, 64, 102, 110.)

12

>paragraph 32 of Mr. Henry's Declaration, the Debtor had turned down $15,000,000.00 in 2008. Mr. Henry's belief that the Debtor had at least that value, if not more, was the golden egg in which he was going to share for his contribution of his million dollars in attorney effort, which return would have made Mr. Henry a millionaire. It is inconceivable that Mr. Henry believed, either consciously or unconsciously, that all he would receive from the Debtor upon its sale for more than $15,000,000.00, was his hourly rate.

(*Id.* at 10–11.)

The Court agrees that it can take judicial notice that lawyers allow clients to get behind on their payments. The schedules of creditors in this case show a number of law firms listed. (Main Case Schs. D and F, Doc. Nos. 84 and 86.) The Court can also take judicial notice that creditors reduce the risks of nonpayment by taking collateral and charging interest. The undisputed facts show that Henry took both these actions. Some of the facts in this case on which the Trustee relies—such as Henry's long relationship with this client, the risk of nonpayment if the project was never developed or sold, and the extensive amount of time dedicated to the client in 2013—are consistent with an attorney-client relationship. They are common enough occurrences in attorney-client relationships that they are noted as factors in considering the reasonableness of fees in Tennessee's Rules for Professional Conduct. Tenn. Sup. Ct. Rule 8, R. Prof. Conduct 1.5(a)(1, 2, 6, 8).[3]

---

[3] A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; . . .

(6) the nature and length of the professional relationship with the client; . . . [and]

13

The Court also notes that Henry substantially increased his hourly rate from $250 to $395 per hour from 2011 to 2014. There is no evidence before the Court that Henry claimed or ever understood he would be paid more than his hourly rates for services and the reimbursement of expenses. If those were not paid timely, he also expected to be paid finance charges.

A survey of cases considering fact patterns where implied partnerships have been found further supports the Court's conclusion that there are no facts before it that create an issue for trial. Pooling operational funds, shared decision-making, and providing services to third parties by the implied partners interchangeably, and proceeds from operations together will lead toward a finding of an implied partnership. *Cf. Bass v. Bass*, 814 S.W.2d at 43 (finding an implied partnership where, *inter alia*, "all income from the businesses was pooled and that the Plaintiff received whatever was necessary from those funds to maintain her standard of living. Similarly, Plaintiff, by virtue of her reliance on the pooled funds, necessarily incurred business obligations whenever expenditures were made from those funds. [Plaintiff] shared in the profits of these businesses, in that she had all of the advantages and obligations of running the businesses."). Sharing operational decisions will suggest an implied partnership, when combined with the sharing of profits and losses independently of any payments toward debts or wages. *See Wyatt*, 281 S.W.2d at 66. Additionally, where two or more individuals run the same business under the same name and use the same invoices containing statements such as, "Thank you, we appreciate your business," courts will find an implied partnership. *See Derickson v. U.S. Dep't of Agric.*, 546 F.3d 335, 342 (6th Cir. 2008) (concluding that "two individuals admitting that they are running the same business under the same name is such evidence that a reasonable mind might

---

(8) whether the fee is fixed or contingent . . . .

14

accept as adequate to support a conclusion" of an implied partnership) (internal quotation marks and citations omitted).  In this case, Henry testified in his declaration, without dispute, there were no pooled funds or joint accounts.  There is no evidence that Henry represented himself as a decision maker for the debtor or as a partner to anyone else.

In contrast, a survey of other scenarios which fall short of establishing an implied partnership are more analogous to this case.  Helping with real-estate improvements will not create an implied partnership, where no evidence existed "that the parties jointly purchased or held the property, that the parties made said improvements for the purpose of selling the property for profit, that [plaintiff] expected to receive a return on her investment in the property beyond her personal use and enjoyment, or that the combination of their efforts, money, skill, et cetera was a business undertaking." *Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010). Henry never held title to the real or personal property belonging to the debtor.  He has expressly stated that he hoped to receive his fees and finance charges but had no expectation of profits. His understanding of the project was that it was "always a Casey family project."  (Doc. No. 136 at 2 ¶ 11.)

A secured lender will not become an implied partner of the borrower, simply because the lender has contractual rights to protect its security interest including inspection of books and advance notice of material changes in business operations.  *See Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 607–08 (Tenn. Ct. App. 2001) ("The fact that each of the defendants expected to profit from the relationships does not mean that they expected to share the profits of Cryotech's business.").  An implied partnership will not arise, where the parties make preparations to operate a corporation for a development project but then abandon the project on feasibility grounds.  *See Kuderewski v. Estate of Hobbs*, No. E2000-02515-COA-

15

R3CV, 2001 WL 862618, at *4 (Tenn. Ct. App. July 30, 2001). Even profit-sharing alone will not create an implied partnership, where control over bank accounts, leases, and criteria for job performance point toward a relationship between a business and its independent contractors. *See Lewis v. Calvert*, No. 3:17-CV-000019, 2019 WL 295089, at *3 (M.D. Tenn. Jan. 23, 2019). Pooling funds with an investment broker as part of an investment club will not constitute an implied partnership. *See In re Taylor & Assocs., L.P.*, 211 F.3d 1270 (6th Cir. 2000). Finally, "[t]he sharing of profits of a business as compensation for personal services does not constitute a partnership." *Bolton v. Morgan*, No. 05-2315 MA/P, 2006 WL 840422, at *4 (W.D. Tenn. Mar. 29, 2006) (quoting *Powell v. Bundy*, 272 S.W.2d 490, 492 (Tenn. Ct. App. 1954) (internal quotation marks and other citations omitted).

Applying the above cases to Henry's pending motion, the undisputed facts show that this case lacks the usual indicia of an implied partnership. Henry denies any understanding that he was going to share in any profits. He took no actions that would constitute an actual sharing of profits and losses. Henry never pooled bank accounts or other funds. Henry's legal bills refer to discussing unspecified "business matters" with the debtor, and the fourth amended complaint contains ambiguous language about "cooperating" with Allen and the debtor, but nothing in the record suggests that Henry invested time, energy, or labor in the debtor's affairs beyond the scope of a provider of legal services or that he had any understanding with anyone else to the contrary.

## CONCLUSION

With the facts not in dispute, the Court concludes as a matter of law that there is no implied partnership. Henry provided legal services and submitted bills for those services. His undisputed understanding of his relationship with this debtor and the barge development project

16

was that he was a creditor, not a partner. He understood that any disbursement of sale proceeds or operational profits that might receive would be for payment of his services. *Cf. H.T. Hackney Co. v. Robert E. Lee Hotel*, 300 S.W. 1, 2 (Tenn. 1927) ("[S]haring profits, either net or gross is not a conclusive test of partnership, for, if it appear by the terms of the contract that a share of the profits is given to one of the parties as compensation for services, the presumption of a partnership is thereby rebutted."). Having shown that the Trustee did not prove the existence of an understanding between him and either the debtor or Allen, a central element for a finding that an implied partnership existed, Henry shifted the burden to the Trustee to come forward with some evidence to show that an understanding did exist with the debtor; that Henry made representations to other parties that a partnership existed; or that Henry took some action that was more partner-like than creditor-like. The Trustee did not. He only argued that he could not imagine any other reason than the hope of a partnership interest that an attorney would go so long without payment. The Court finds that suppositions about Henry's hopes are more in line with an attempt to create "some metaphysical doubt" than a clear and convincing contradiction of Henry's declarations and the undisputed facts. The Court concludes that there are no issues for trial.

For the foregoing reasons, the Court grants Henry's motion for summary judgment on the Trustee's counterclaim and declares that no implied partnership existed between Henry, Emma Casey and the Debtor. (Doc. No. 135.)

###