

**SIGNED this 31st day of March, 2022**

*Shelley D. Rucker*
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

In re:

**River City Resort, Inc.,**
          **Debtor.**

**No. 1:14-bk-10745-SDR**

**Chapter 7**


**James L. Henry,**
          **Plaintiff,**

**v.**

**Adv. No. 1:18-ap-01029-SDR**

**Estate of Emma P. Casey and B. Allen Casey,
Individually, jointly, severally, d/b/a Casey Family
Partnership,**
          **Defendant.**


**Jerrold D. Farinash, *Trustee*,**
          **Plaintiff,**

**v.**

**Adv. No. 1:18-ap-01044-SDR**

**James L. Henry, Jr.,**
          **Defendant.**

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION

Over the course of about 13 years, attorney James L. Henry, Jr. ("Henry")[1] performed

legal work for debtor River City Resort, Inc. ("RCR").  When RCR could not pay for Henry's

legal services, the debtor's principal, B. Allen Casey, Jr. ("Allen"), signed a promissory note in

August of 2011 that was secured by Lots 1, 4, and 5 of the River City Resorts Subdivision.

Allen pledged the property through a deed of trust.  The amount owed at that time was

$182,728.32.  The note accrued interest at 18%.  When the debtor filed bankruptcy, Henry filed

Claim 16 to assert his position as the holder of a claim for his legal bills.  The amount he claimed

had grown to $1,232,403.41 and included the charges for additional services provided after the

date of the note.

As the Main Case ran its course—first in Chapter 11, now in Chapter 7—the Trustee

negotiated agreements with a number of creditors who also asserted that they were lien holders.

Of particular relevance here are agreements that the Trustee reached with Henry and with

members of the Casey family, including Allen's wife Emma P. Casey ("Emma").  In short,

Henry did not object to a sale of the property that secured his promissory note from the debtor to

an entity called American River Development, LLC ("ARD").  The Henry Sale Order provided

that his lien would attach to the sale proceeds.  Around the same time, and over Henry's

objection, the Trustee was authorized to settle the claims of members of the Casey family in such

a way that their asserted secured claims of about $5.5 million reduced to $3,575,000.  The Casey

---

[1] For the sake of clarity, the Court notes that "James L. Henry, Jr.," the claimant who filed Claim 16 in Main Case No. 1:14-bk-10745-SDR and who is the defendant in Adversary Proceeding No. 1:18-ap-01044-SDR, is the same person as "James L. Henry," the plaintiff in Adversary Proceeding No. 1:18-ap-01029-SDR.

family liens were recorded prior to Henry's.  The Trustee contends that, to the extent the Casey

family liens were avoided, the liens remained for the benefit of the estate under 11 U.S.C. § 551.

The Trustee's agreements with Henry and other lien holders formed the backdrop for

what happened next and for what the Court is addressing today.  Despite not objecting to the sale

of the property that secured his promissory note, once the sale occurred, Henry sued members of

the Casey family and the buyer of the real property, ARD, in state court to challenge ARD as a

shell company or partnership controlled by the Casey family and to challenge the sale as a

maneuver by the Casey family to avoid paying Henry's legal bills.  On the same day when he

filed his state-court case, Henry recorded a lis pendens that attached to the three lots that secured

his promissory note; one additional lot from the same subdivision; and Emma's personal

residence.  A flurry of litigation followed.  The Casey family members whom Henry sued

removed the state-court case to this Court, and that case was designated as Adversary Proceeding

No. 1:18-ap-01029-SDR (the "1029 Proceeding").  In the 1029 Proceeding, Emma filed a

counterclaim accusing Henry of slander of title to her residence and of contempt of prior Court

orders approving the property sale free and clear of the claims of creditors and approving the

settlement of claims with the Casey family.  Meanwhile, the Trustee commenced a second

adversary proceeding, designated as Adversary Proceeding No. 1:18-ap-01044-SDR (the "1044

Proceeding"), to hold Henry in contempt and either to disallow Claim 16 in its entirety for

excessive legal billing; or to invoke equitable subordination under 11 U.S.C. § 510 because of

Henry's slander of title to the lots that were sold to ARD.

Pending now before the Court are three motions in the two adversary proceedings that

were prompted by Henry's state-court litigation.  In the 1029 Proceeding, Henry has filed a

motion for summary judgment on Emma's counterclaim.  (1029 Proceeding, Doc. No. 175.)  In the

1044 Proceeding, the Trustee filed a motion for partial summary judgment declaring Henry's lien

unsecured (1044 Proceeding, Doc. No. 71), while Henry filed a motion for summary judgment on

all three counts of the Trustee's adversary complaint (1044 Proceeding, Doc. No. 82.)

The Court found previously that it has jurisdiction over both adversary proceedings, and

that the adversary proceedings are core proceedings.  Given the extensive information available

in the record, the Court has decided that oral argument for the three pending motions is not

necessary.  For the reasons below, the Court will grant the Trustee's motion for partial summary

judgment in the 1044 Proceeding.  Henry's motions for summary judgment in each adversary

proceeding will be granted in part and denied in part.

## II.    BACKGROUND

As the parties are well aware, the Main Case and the two adversary proceedings being

addressed today have an extensive combined history that has developed across the three dockets.

For the sake of brevity, the Court will endeavor to limit this Background section to the

information most directly relevant to the pending motions.

### A.  *Henry's Legal Bills and the Genesis of Claim 16*

Many of the issues that are pending between the parties directly or indirectly relate to

legal services that Henry provided for the debtor and that remain unpaid.  The Court summarized

the legal services and the billing in a Memorandum Order issued on February 9, 2021 in the 1029

Proceeding.  To avoid repetition, the Court will quote its prior summary here:

> Henry is an attorney licensed to practice law since 1976.  (Doc. No. 136 at
> 2.)[2]  He represented the debtor and its predecessor entities from approximately
> 1991 to the filing of the petition in 2014.  (*Id.*)  His fee agreement was to be paid

---

[2] Docket references in this block quote are to the 1029 Proceeding.

his hourly rate plus interest on unpaid balances.  (*Id.*)  In 2003, Henry was paid
$471,000 for fees plus other sums.  In 2008, Henry was paid $35,000 following
the sale of a portion of the debtor's property.  (*Id.* at 3–4.)  Henry billed the debtor
monthly until about 2011.  The debtor had begun accruing charges for legal
services that Henry performed and billed from time to time.

The trustee provided six billing statements for the period after Mr. Henry
ceased billing monthly.  The first bill, dated April 22, 2011, totaled $182,728.32.
(Doc. No. 152 at 16–26.)  The April 2011 bill contained line items for services
such as legal research; drafting of legal documents; legal analysis and advice;
preparation of discovery responses for state-court litigation involving the debtor;
and settlement negotiations.  The April 2011 bill also contained line items for
conferences about "business matters"; discussions about purchase offers; drafting
of documents for "River projects"; and property inspection and review.  Henry
provided 256.3 hours of services at the rate of $250 an hour.  The bill included
$6,404.48 for finance charges.

A second bill dated April 18, 2012 totaled $132,246.37 (*id.* at 27–48) for
fees and expenses; this bill contained similar line items including references to
calculating membership note percentages; extensions of offers to purchase;
reviews of loan status and loan requests; and reviews of dockets from ongoing
cases in state court.  Henry provided 381 hours of legal services at the rate of
$325 an hour.  This bill also included finance charges of $32,620.76.

A third bill dated July 6, 2012 totaled $15,963.81 (*id.* at 49–55); this bill
contained line items like the ones cited above plus references to preparing wills;
drafting powers of attorney; and reviewing both joint venture proposals and
alternative project financing.  In this bill, Henry provided 46.4 hours of legal
services at the rate of $325 an hour.  Finance charges of $13,541.94 were added to
the outstanding balance for services.

Substantially similar line items appeared in the fourth bill dated December
31, 2012, totaling $60,283.63 (*id.* at 56–66).  Henry provided 166.7 hours of legal
services at the rate of $350 an hour during this period.  Additional finance charges
of $33,102.25 were added to the outstanding balance for services.

The fifth bill dated January 8, 2014 totaled $534,669.49 for fees and
expenses (*id.* at 67–104).  This bill covered approximately 13 months.  During
this period Henry provided 1,205.9 hours of legal services at the rate of $395 an
hour.  This bill also reflects the addition of $86,270.22 in finance charges.  During
this period, the debtor was involved in several lawsuits with its other investors
and creditors that were approaching trials from a review of the time entries.

The sixth bill and final bill for the prepetition period is dated February 19,
2014.  It seeks fees and expenses totaling $101,730.03 plus a finance charge of

5

$22,605.99 (*id.* at 105–12).  The line items in the legal bills are consistent with
prior billings related to corporate and litigation work and the language in the
fourth amended complaint that Henry "cooperated with Allen Casey" (Doc. No.
64 at 2, 8) in helping to execute some of the debtor's real-estate transactions.
None of the statements shows any credits for payments on the past due balances.
The debtor does not appear to have paid Henry for any of his billings from 2008
until 2014.

(1029 Proceeding, Doc. No. 154 at 3–5.)  Henry filed Claim 16 in the Main Case on June 27,

2014, asserting a secured claim for balance of the promissory note and his legal fees, for a total

of $1,232,403.41.  He amended the claim on June 30, 2014 to reduce the amount to

$1,232,069.07.  Henry's legal bills are part of the record in the 1029 Proceeding.  In the

Memorandum Order of February 9, 2021 in the 1029 Proceeding, the Court described the

background to Henry's assertion of secured-claim status:

> In 2011, Henry obtained a promissory note signed by the debtor, The
> Cornerstone of River City Resort, LLC (an affiliate of the debtor), and Allen for
> an amount that corresponded to the balance due on the April 11, 2011 billing
> statement.  The note is dated April 11, 2011, but the signatures for the debtor and
> Allen are dated August 23, 2011.  The promissory note contained language that
> the signatories would pay Henry "the sum of One Hundred Eighty-Two Thousand
> Seven Hundred Twenty Eight and 32/100 Dollars ($182,728.32) or so much as
> may be advanced from time to time payable upon demand together with interest at
> eighteen percent (18%) per annum."  (Main Case Claim 16-2 Part 3 at 1.)  The
> promissory note contained additional language that, at Henry's option, the note
> would become payable immediately if either the debtor or Allen filed for
> bankruptcy.  (*Id.* at 1–2.)  The note obligation was secured by a pledge of three
> lots of the debtor's real property and the barge that Allen planned to turn into a
> floating resort.  The security interest was evidenced by a deed of trust executed on
> August 23, 2011, and recorded in the Register's Office of Hamilton County
> Tennessee at Book 9554, Page 195 on January 12, 2012. (Main Case Claim 16,
> Parts 3 and 4.)

(1029 Proceeding, Doc. No. 154 at 5.)  The three lots of real property mentioned in the

promissory note and the deed of trust are described as Lots 1, 4, and 5 of the River City Resorts

Subdivision.

6

To sell the lots, the Trustee needed the consent of the creditors who claimed liens to the property and who had asserted claims against each other. A notice of intent to sell the property was first filed on July 1, 2016. (Main Case, Doc. No. 341.) A motion to settle with the creditors was filed on September 26, 2016. (Main Case, Doc. No. 374.) Prior to either of these motions, on February 26, 2016, the Court entered an agreed order in which Henry consented to the sale of the property. (Main Case, Doc. No. 308 (the "Henry Sale Order".) Henry retained the right to object to the amount of the sale. Under the terms of the agreed order of February 26, 2016, Henry also retained the right to object "at any time to the claims of other creditors and/or to any other action taken by Trustee in this case, including, without limitation, objections to Trustee's proposed settlements with other creditors or third parties. All valid and perfected liens will attach to the proceeds from any sale of the Property approved by the Court." (Main Case, Doc. No. 308 at 2.) When the sale and settlement motions were filed, Henry did not object to the sale but did object to the settlement. (Main Case, Doc. No. 378.) The Court overruled his objection, approved the settlement, and authorized the sale. After a failed attempt to sell the property in 2016, on October 19, 2017, the Trustee filed a second motion to sell Lots 1, 4, and 5 free and clear of liens, with all liens to attach to the net proceeds of the sale. (Main Case, Doc. No. 425.) Henry filed no objections, and the Court granted the motion on November 21, 2017. (Main Case, Doc. No. 443 (the "Trustee Sale Order").) The Trustee sold the three lots and one other lot on February 9, 2018 for $5,500,000.00 to American River Development, LLC ("ARD"), a backup bidder. (Main Case, Doc. Nos. 443, 446 at 2.)

**B.   *Henry's Attempts to Collect His Legal Bills, and the Genesis of the 1029 and 1044 Proceedings***

Both the 1029 and 1044 Proceedings trace their origins to what Henry has done since 2014 to try to collect his legal bills.  The debtor filed its original Chapter 11 voluntary petition on February 24, 2014.  Henry timely filed Claim 16 asserting a secured claim for his legal fees of $1,232,069.07.  The Trustee was appointed in the Chapter 11 phase of the Main Case, by agreed order, on February 25, 2015.  (Main Case, Doc. No. 184.)  The Main Case was later converted to a Chapter 7 liquidation on June 12, 2015.  (Main Case, Doc. No. 270.)  As the Court noted above, the Trustee sold the real property that secured Henry's note on February 9, 2018, without any objection from Henry because of the Henry Sale Order.  On July 13, 2018, Henry sued ARD and members of the Casey family in state court to challenge ARD's existence as a separate entity.  He contended that ARD was a shell company or partnership controlled by the Casey family and challenged the February 9, 2018 sale as a maneuver by the Casey family to avoid paying Henry's legal bills.  (1044 Proceeding, Doc. No. 113-2.)  Henry contended that Allen and Emma both individually owed him for his services, although his theory for Emma's liability has evolved over the course of the case.  (*Compare* 1029 Proceeding, Doc. No. 1-2 at 12 (tying Emma's liability to "an attempt to disguise Emma's equity interest" in ARD as a secured loan) *with* Doc. No. 24 at 6 ("Emma combined her rights, interest and authority in ARD with Allen's labor, skill and experience and real estate business for profit in their [implied partnership]") *and* Doc. No. 43 at 10 (adding that certain alleged actions by Emma "constitute her acceptance of the [implied partnership's] liability to Plaintiff for Allen's debt and Note to Plaintiff") *and* Doc. No. 64 at 11–12 (adding that the implied partnership arose from Emma's actions "in combination with Allen's labor, skill and real estate business experience for the sale of the Lots for profit")

8

*and* 1044 Proceeding, Doc. No. 85 at 5–6 (adding assurances from Emma that Henry would be paid).)  The sale to ARD allegedly added new assets—*i.e.*, the partnership interests in ARD—on their balance sheets, and Henry intended to try to attach those new assets.  Critical to Henry's theory of liability was a distinction between any partnerships that the Casey family created and ran before the debtor's bankruptcy filing and any partnerships, like ARD, that arose post-settlement.  The Court will say more about this distinction below; in short, Henry contends that this distinction gives him a basis to litigate his claims against Allen and Emma in state court, independent of any conduct pre-settlement that might have created any liability from Emma to him.  Along with the filing of his complaint, Henry recorded a notice of lis pendens with the Hamilton County Register of Deeds, under Tenn. Code Ann. § 20-3-101(a), that attached to Lots 1, 4, and 5 of the real property described in his deed of trust; Lot 3, the additional lot sold on February 9, 2018; and Emma's personal residence at 723 East Brow Road in Lookout Mountain, Tennessee.  (1029 Proceeding, Doc. No. 175-1.)  The defendants in state court viewed that Henry's claims were all based on the same conduct that gave rise to the Trustee's claims, which they believed had been settled.  They, therefore, removed Henry's case to this Court on August 13, 2018 (Main Case, Doc. No. 469), and the state-court case became the 1029 Proceeding.  One of the defendants[3] in the 1029 Proceeding filed a counterclaim against Henry (Doc. No. 34) accusing Henry of slander of title in violation of Court orders.  The counterclaim is substantively similar to the first two counts of the adversary complaint in the 1044 Proceeding, which the Court will explain below.

_____

[3] In his motion for summary judgment in the 1029 Proceeding, Henry disputes who the proper defendant should be.  The Court will address the issue in more detail below.

The complaint and the lis pendens that Henry filed and recorded prompted the Trustee to commence the 1044 Proceeding by filing a complaint on October 23, 2018.  (1044 Proceeding, Doc. No. 1.)  In the complaint, the Trustee reviews the history of Henry's Claim 16, including the facts that the Court summarized above and Henry's decision, on August 28, 2018, to release the lis pendens against the real property that had secured his note but was sold free and clear of his lien on February 9, 2018.

The complaint contains three counts.  In Count 1, the Trustee seeks equitable subordination of Claim 16, under 11 U.S.C. § 510, because of Henry's "slandering of the title of a purchaser from the Bankruptcy Trustee and the asserting of claims which were property of the Bankruptcy Estate."  (*Id.* at 6 ¶ 27.)  In Count 2, the Trustee seeks a finding of contempt against Henry for "disregarding the Orders of this Court" (*id.* ¶ 29), presumably the Trustee Sale Order. In Count 3, the Trustee objects to Henry's Claim 16 as "overstated in amount."  (*Id.* ¶ 30.)  "The Deed of Trust in question is for $182,728.32 as of January 12, 2012.  It is inconceivable that between that date and the date of the filing of Mr. Henry's claim on June 30, 2014, that his claim could increase."  (*Id.*)  The Trustee did not have Henry's itemized billing when he filed the complaint, but he did receive and review them no later than December 4, 2020, the date of a declaration that he filed in the 1029 Proceeding.  (*See* 1029 Proceeding, Doc. No. 152 at 15 ("I have recently requested Plaintiff Jim Henry's billing statements on behalf of the Debtor and they were supplied and I have attached them to this declaration.").  Following his review of the itemized billing, the Trustee holds to his belief that Henry's legal bills could not have increased by over $1 million between January 12, 2012, when the deed of trust securing Henry's note was recorded, and June 30, 2014, when Henry filed the amended version of Claim 16.  The Trustee's

position, however, has become more nuanced. The Court will assess the Trustee's position in more detail below; in short, the Trustee maintains Count 3 on the basis that at least some of Henry's legal services after January 12, 2012 were not performed for the debtor and should not have accrued interest.

### C. Trustee Wants Claim 16 Deemed Unsecured (1044 Proceeding, Plaintiff's Motion for Partial Summary Judgment)

As part of Count 3 and his overall challenge to Claim 16, the Trustee filed his pending motion in the 1044 Proceeding to attack Claim 16 from a new angle not explicitly raised in the complaint.[4] The Trustee believes that Henry's claim is unsecured because of the presence of superior liens and how those superior liens were resolved. In short, between 2004 and 2009, members of the Casey family, individually and through a corporate entity that they controlled, issued promissory notes to the debtor that were secured by real property, pledged to them by recorded deeds of trust. During the history of the Main Case, these creditors became known as the "Casey Creditors." The Casey Creditors filed Claims 27, 28, and 29 in the Main Case, asserting a total secured amount of $5,599,889.97. The claims of the Casey Creditors were superior to Henry's claim because they were recorded earlier; nevertheless, the Trustee contended that they could be subordinated or recharacterized. On September 26, 2016, the

---

[4] If the Main Case did not have the lengthy history that it does, and if counsel for the parties were not as intimately familiar with Henry's legal billing as they are, then the Court would be concerned that the principal argument for summary judgment in the Trustee's motion never appeared in the complaint. Under the circumstances, however, of a lengthy case history, familiarity with the issues surrounding Henry's legal billing, and the decision by Henry to respond to the motion on substance without raising any procedural objections, the Court will proceed to address the Trustee's motion "in the interest of judicial efficiency." *Livneh v. Vill. of Oak Harbor*, No. 3:15 CV 2323, 2017 WL 3575852, at *2 n.3 (N.D. Ohio Aug. 17, 2017); *cf. OverDrive, Inc. v. Open eBook F.*, No. 1:17 CV 165, 2019 WL 3530402, at *2 (N.D. Ohio May 16, 2019) (motion to strike a summary judgment motion denied, where "over the course of two years, the parties have engaged in discovery" on an issue raised in the summary judgment motion papers but not explicitly pled in the complaint, meaning that "Plaintiff has not presented a new claim in its motion for summary judgment that would disadvantage or surprise Defendant").

11

Trustee filed a motion to settle the claims of the Casey Creditors.  (Main Case, Doc. No. 374.)

Among other terms of the settlement, the Casey Creditors would have the liens securing Claims

27, 28, and 29 set aside under 11 U.S.C. §§ 544, 545, 548, 550, and 551.  (*Id.* at 3.)  The Trustee,

in exchange, would pay the Casey Creditors $3,575,000.00 (*id.* at 3), and the following

unsecured claims would be allowed without further order of the Court: "(a) Claim 27, Lynn P.

Casey $163,410.00; (b) Claim 28, Heavens No, LLC $667,715.00; (c) Claim 29, Emma P. Casey

$1,193,760.00" (*id.* at 13).  The settlement terms also contained a release provision under which

the bankruptcy estate would assume liability for any claims that other creditors, including Henry,

might have had against the Casey Creditors "under 11 U.S.C. §§ 541, 542, 544, 547, 548, 549

and 550."  (*Id.* at 3.)  Henry objected to allowance of the Casey Creditors' claims and the

allowance and proposed payment of the claims of other parties to the settlement.  He contended

that there were defenses to the liens and, in fact, to the debtor's entire liability for the amounts

claimed by the Casey Creditors, because a) one of the loans had been paid by a transfer of

property; b) "[t]he Emma Casey alleged note and deed of trust on Lot 4 is a disguised partnership

control mechanism for no consideration from Emma Casey to RCR that allows Emma Casey to

exercise control over Lot 4 as alleged secured 1st mortgage/deed of trust creditor"; or c) the

loans were equity contributions.  (Main Case, Doc. No. 378 at 2.)  Over Henry's objection, the

Court approved the settlement on November 7, 2016.  (Main Case, Doc. No. 393.)  After the

Court approved the February 9, 2018 property sale, the Trustee reported using the sale proceeds

to pay $455,663.00 to settle a super-priority lien of Southern Community Bank that the Court

had authorized post-petition under 11 U.S.C. § 364(c) and (d).  (Main Case, Doc. Nos. 244, 446

12

at 3.)  The Trustee also used sale proceeds to pay city and county property taxes in the amount of

$298,300.00.  (Main Case, Doc. No. 446 at 3–4.)

The disposition of the remaining proceeds of the February 9, 2018 property sale,

combined with the resolution of Claims 27, 28, and 29, now provide the foundation for the

Trustee's pending motion in the 1044 Proceeding.  According to the Trustee, the avoidance of

the Casey Creditors' liens in excess of $3,575,000—on the property that composed the bulk of

the estate and under 11 U.S.C. §§ 541, 542, 544, 547, 548, 549 and 550—means that those liens,

under Section 551, now are preserved for the benefit of the estate.  "Thus, any interest Henry has

is subordinate to the Estate's interest."  (1044 Proceeding, Doc. No. 72 at 5.)  If the estate holds

the avoided lien of $2,024,889 from the Casey Creditors' liens then the purchase price of

$5,500,000 was not enough to pay that first-in-priority lien that secured a debt of $5,575,000.

Henry's lien would be out of the money even further when the superiority lien of Southern

Community Bank of $455,663 and the real estate taxes of $298,300 are considered:

> The Report of Sale of the property against which Henry claims a lien
> showed a sales price of $5,500,000.00.  Because the claims of the Casey Creditors
> exceeds the amount of funds recovered from the property on which Henry asserts
> a lien, the §551 inquiry could end there.  There is no equity over and above the
> liens avoided for the benefit of the estate with which to satisfy the claims of
> Henry.  Henry does not "move up."  The purpose behind § 551 is to keep the
> junior lien holders in the same position they bargained for.  When Henry
> bargained for his lien, he knew there was $5,599,889.97 of liens in front of his
> position.  He must stay in that position and only the bankruptcy estate benefits
> from the avoidance of the superior Casey Creditor liens.  A deeper analysis of the
> § 551 issue and the happenings in this case would clearly show that Henry has no
> secured lien.

> Soon after the Trustee was appointed in this case, the Court approved
> Post-Petition financing in the amount of $350,000.00.  That financing was
> provided by Southern Community Bank.  In the order approving that financing,
> Southern Community Bank was given a super priority lien for the amounts it was
> owed in order to provide the post-petition financing.  At closing, that amount was
> $455,663.55.

At closing, the Trustee had to pay many years of property taxes.  The total property taxes paid at the time of closing was $298,300.63.  Below is a chart detailing the liens superior to Henry's lien:

Amount of Casey Creditor lien avoided for the benefit of the Estate: $2,024,889.00

| | |
|---|---|
| Super priority lien of Southern Community Bank: | $  455,663.00 |
| Real Estate Taxes: | $  298,300.00 |
| Approved payment to Casey Creditors | $3,575,000.00 |
| Total liens superior to Henry | $6,353,852.00 |
| Purchase price | $5,500,000.00 |
| Amount available to pay Henry liens | ($  853,852.00) |

The Bankruptcy Estate would have to have recovered an additional $853,852.00 before Henry received any payment on his liens.

(*Id.* at 7.)  If the Trustee were correct about the number of liens superior to Henry's—particularly the superiority of the amount avoided from the Casey Creditors' lien—then payments to those superior liens have exhausted value from the sale, leaving Henry's claim unsecured.

Henry does not dispute that the allowed Casey Creditor lien, the super-priority lien, and the real estate taxes would have priority over his lien.  (1044 Proceeding, Doc. No. 77 at 4.)  According to Henry, the Casey Creditors' lien was avoided in part because of the Trustee's assertion "that the claims of the 'Casey Creditors' are or should be considered equity, rather than debt, pursuant to the theories of either equitable subordination, re-characterization of debt to equity, or implied partnership."  (Main Case, Doc. No. 374 at 2.)  Henry relies on the assertion that the reduction of the Casey Creditors' lien that the Court approved on November 7, 2016 actually did occur because of a reclassification from debt to equity under one of the equitable theories cited by the Trustee in his motion.  However, the settlement agreement specifically mentions Bankruptcy Code avoidance powers and the Bankruptcy Code provision that preserves the transfer for the estate, namely 11 U.S.C. § 551.  Henry also contends that the Trustee has administered estate funds inconsistently, causing lien holders subordinate to Henry to move up

14

and to be paid.  Henry is referring to the Trustee's decision to settle with other parties who

asserted liens that were junior to Henry's; these creditors received a total of about $1.5 million.

(*See* 1044 Proceeding, Doc. No. 76 at 6 ("If the Trustee is correct in the position he is asserting

in this Motion, he never should have agreed to pay the Barge Creditors, Moss, Neuhoff and

Xylem over $770,000.00.  They were all junior to the Casey Creditors' liens, and most were

junior to Henry.  All of them should have been treated as the Trustee is now trying to treat

Henry.").)

The Trustee's main point in reply concerns Henry's conditional assertion, that the

Trustee's position would be correct if the Casey Creditors' lien had been avoided under Sections

547 or 548.  "The law of the case is that the Court has found the Casey Creditor liens were

avoid[ed] pursuant to 11 U.S.C. §§ 541, 542, 547, 548, 549, and 550.  Thus, by Henry's own

admission, the Trustee's Motion should be granted."  (Doc. No. 80 at 2–3.)

### D.  Henry's Motion in the 1044 Proceeding

While the Trustee wants to reclassify Henry's Claim 16 through his pending motion in the

1044 Proceeding, Henry filed a motion for summary judgment on the entirety of the Trustee's

complaint.  Henry makes multiple arguments against Count 1 and equitable subordination: that the

Trustee has not shown how Henry defrauded any creditors of the debtor; that no evidence points to

any breach of a fiduciary duty by Henry; that Henry never alleged that the February 9, 2018

property sale was not free and clear of liens so as to impugn title to the real property in question;

and that, even if slander of title occurred, the Trustee lacks standing to seek damages for an injury

that would have occurred to ARD and not to the estate.  Henry describes his commencement of

litigation in state court not as an attempt to undermine the February 9, 2018 property sale but as a

response to what he sincerely believed were newly discovered circumstances:

15

> In the instant case, the Trustee has provided no facts in his complaint to support the inference that Henry engaged in any fraudulent conduct which was harmful to any of the other creditors of the Debtor.  After the sale to American River Development, LLC ("ARD"), Henry became aware of facts that he thought would allow him to recover his prepetition debt from Allen and Emma Casey.  He had—or believed he had—direct rights of action against both of them for it.  His suit was triggered when he saw that they were exercising the ownership interest in ARD, just as they had done with RCR.  Allen's Chapter 7 had been dismissed with no discharge, and creditors could pursue him for collection.  Henry's factual allegations that Emma had engaged in the same partnership-type conduct with RCR were true, but he was not suing her for that.  She assured him, during the course of their long relationship, that his fees would be paid, and this was the cause of action.  The Trustee has no standing to complain about this, and it is certainly not fraudulent.

(1044 Proceeding, Doc. No. 85 at 5–6.)  Henry argues against Count 2 and any finding of contempt

by distinguishing Emma's potential liability to the estate from her potential liability to him:

> In the instant case, the Settlement Order and the [Henry] Sale Order released Emma from liability from the Trustee and all creditors for implied partnership with RCR.  It did not address her prepetition or post-petition implied partnerships with Allen in their various ventures.  RCR's estate did not acquire those.  The settlement could only pertain to actions owned by RCR's estate, which were derivative.  *In re Speich Farms, LLC*, 603 B.R. 395, 401(Bankr. W.D. Mich. 2019) (Derivative and direct actions distinguished).  It furthermore did not settle direct or personal actions that Henry could assert against Emma or any other third party.  Nor did it settle actions Henry had against Allen such as the Promissory Note.  If Emma was helping Allen to hide assets in her/their properties before or after the petition, which they were alleged to be doing, neither the Settlement Order nor the [Henry] Sale Order covered that.  The Trustee cannot presume to know the extent of the agreements between Henry and the Caseys from their decades-long relationship.  Some of this even occurred post-petition, as shown by Henry's declaration.

(*Id.* at 9.)  Finally, Henry challenges Count 3 by emphasizing that he now has furnished itemized

billing to the Trustee to substantiate the balance that he asserted in his proof of claim.  "Since

the Trustee has less than $400,000 on hand, and Henry's lien still attaches to this fund, the

Trustee would have to come forward with proof that the claim is less than the funds on hand."

(*Id.* at 12.)

16

The Trustee opposes Henry's motion in all respects.  With respect to Count 1 of the

complaint and equitable subordination, the Trustee argues that

> Henry engaged in inequitable conduct when he openly defied the Court's order by
> filing a Lien Lis Pendens on the property that the court had previously ordered
> was to be sold free and clear of all liens and encumbrances.  In that order, Henry's
> lien was specifically outlined as a lien or encumbrance that was no longer
> attached to the property.  Through this order, Henry knew that any claim he had
> against that property was going to attach to the proceeds of the sale.  The Trustee
> avers that the actions of Henry in the filing of the Chancery Court action against
> American River Development, LLC, and thereafter placing a Lien Lis Pendens on
> the property sold by the Trustee resulted in injury to other creditors and was an
> attempt to confer an unfair advantage on Henry in that it (1) slandered the Title of
> ARD, therefore subjecting the Bankruptcy Estate to claims by ARD, (2) caused
> the Trustee damages by publishing to the world via the press that this Trustee's
> sale of property free and clear of liens cannot be trusted, and (3) damaged this
> Bankruptcy Estate by causing it to incur costs and expenses in the defense of its
> sale of property free and clear of liens.

(1044 Proceeding, Doc. No. 102 at 2–3.)  For Count 2, the Trustee confirms which orders Henry

allegedly has violated to subject him to possible contempt: the Henry Sale Order (Main Case,

Doc. No. 308); and the Trustee Sale Order (Main Case, Doc. No. 443).  In support of Count 3,

the Trustee elaborates on why he believes that Henry's lien could not have grown by over $1

million from the recording of the deed of trust on January 12, 2012 to the filing of the amended

version of Claim 16 on June 30, 2014:

> The amount claimed is owed by others and not the Debtor in the underlying case.
> Much of the work performed by Henry for which he is asserting claims against
> this Bankruptcy Estate was performed on behalf of Allen B. Casey individually.
> Further, it appears the claim may include interest that is ethically prohibited.
> According to the Board of Professional Responsibility of the Supreme Court of
> Tennessee Formal Ethics opinion 82-F-28 the Committee stated that "there is no
> impropriety in an attorney charging interest on accounts more than 30 days
> delinquent, provided the following conditions are fully and completely observed:
> (1) Notice of the intent to charge interest on such accounts shall be sent to all
> clients; (2) The charging interest is limited to statements made after such
> notification; (3) The maximum rate of interest utilized in computing such interest
> shall not exceed the rate specified in TCA 47-14-121 as the rate of post-judgment
> interest."

17

(1044 Proceeding, Doc. No. 102 at 4–5.)

Following a reopening of discovery that the Court authorized to allow the parties to take

depositions, the Trustee filed a supplemental response to Henry's motion that further supports his

opposition.  (1044 Proceeding, Doc. No. 113.)  With respect to Count 1 and equitable

subordination, the Trustee points to deposition testimony suggesting that Henry had no

reasonable basis for his litigation in state court and simply was trying to maneuver ahead of liens

senior to his own.  At his deposition on August 17, 2021, Henry acknowledged that the

November 7, 2016 settlement order removed the Casey Creditors from the Main Case by having

the bankruptcy estate assume any liability against them under 11 U.S.C. §§ 541, 542, 544, 547,

548, 549 and 550.  (*See* 1044 Proceeding, Doc. No. 113-3 at 27 ("Q.  Can you tell me why they

[Allen and Emma] would form a new partnership?  A.  Well, the order—that RCR order covered

the RCR assets and Emma's relationship to them, right?  Q.  Right.  Basically the true fact is the

only way you could sue her was to allege there was a new partnership?  A.  Right.").  Henry

knew, therefore, that he could sue members of the Casey family covered by the settlement order

if and only if he alleged a post-settlement partnership and post-settlement conduct not covered by

that order.  This knowledge, according to the Trustee, gave Henry the motive to declare a new

implied partnership in the Casey family and to label it the "Casey Family Partnership":

> Q.  You'll agree that the term Casey Family Partnership is a term that you've
> coined and put into this Complaint?
>
> A.  To cover that concept without going two paragraphs.
>
> * * * *
>
> Q.  All right.  Tell me what they did, what Emma and Allen did when they—when
> American River Development took ownership of the Barge property, tell
> me what Emma and Allen did that differentiated that property from all this

18

other where they have agreed to combine their efforts and their money. Why is it separate from all of that?

A. Well, I think the bankruptcy settlement order cut off their—them on its effect, but then once the property was sold to ARD, they were free to go back and set up the standard MO that they had of Emma putting up money, which she had done in ARD it appears, at least through a credit bid, maybe indirectly financing through the two brothers, but they feel free to go in the market and say we're in control of this property.

My assumption is that Emma is saying, in essence, we put up all the money, I'm free of bankruptcy, we can go do what we want. So, Allen is out marketing all over town and talking among the commercial real estate, and Emma is putting up her assets.

Q. Did Emma ever tell you she was putting up her assets?

A. She did not.

Q. All right. So, as I understand what you're saying, I want to make sure, what you're saying is, is that there was something in the bankruptcy settlement that would have prohibited the Casey Family Partnership from continuing to own the Barge property through this new company, American River Development? You're saying the old Casey Family Partnership was prohibited as a result of the settlement from owning the Barge property for whatever mechanism it used? Is that what you're saying?

A. Yeah. Yes.

Q. All right.

A. But once the bankruptcy—once the land was out of bankruptcy, they felt free of the Court, free of creditors, they could go do as they intended and apart from lawyers.

(*Id.* at 6, 12–13.) Henry had no evidence to support his theory of a new implied partnership apart from a single letter that he saw once suggesting that ARD might sell the properties that it acquired on February 6, 2018 from the debtor. (*Id.* at 11.) Henry rested his theory of a new implied partnership on his observations of how Allen and Emma moved around their money and his evaluation of whether their transactions created new debt obligations or amounted to equity:

19

[L]et's see, at this time—we had the first ten years that RCR was related to the—
trying to do a barge hotel on the river and had a series of investors.  That
failed. The bank wouldn't make a loan on it.

So, then Emma effectively bought out the other shareholders and became a sole
shareholder.  Then when litigation—this is later—coming from 1991 to
this period, this is once we were—she no longer—she gifted her stock or
transferred her stock to Allen 100 percent.  She did not want to be a
shareholder once lawsuits began being filed or were filed, the lawsuits sat
dormant for several years because the various investors wanted the
property to sell.

So, then Frank Brown said he was going to retire and wanted to get the cases off
his docket for the new incoming Chancellor, whoever that would be.  So,
then he started pressing these cases vigorously to get settled.  That's when
it became adversarial among the shareholders.  They had filed lawsuits
and everyone was friendly just waiting for the property to sell.

Then Frank Brown started pushing the cases vigorously to be resolved.  Emma
then wanted to put—didn't want to be—she shifted her—I want to give
my stock to Allen trying to get away from the litigation.  Then Allen, he
needed money.  He would go to Emma.  Emma would write a check to
Allen.  Allen would put it in his own accounts and then put it into River
City Resort, and I'm calling that account their Casey Family Partnership
mechanism.

This went on for several years unbeknownst to me.  Then I found out about it.  I
said, that's terrible.  You-all are just making equity contributions because
Emma gives—writes a check to Allen and Allen takes and deposits it into
Allen's account to go and then put it in River City Resort.  I said, you
know, you're trying to make—that went on for several years.  I said,
that's—I mean, I'm calling Allen's account this Casey Family Partnership
account.  He was using his account as an intermediary to get it into the
River City Resort.

I found out about it and said, that is not creating a debt, you're creating equity,
and you need to write—if Emma wants to claim a debt, she needs to write
a check directly to River City Resort, not write it to you and you put it in
your account.

So, I'm calling that account of Allen, they were using that as a partnership
account and not creating debt, creating equity.  I said, that's not the way to
do it.  And they had been doing that for years.  I didn't know it.  And

when I found out, I said, you shouldn't do that if you're trying to create
debt.

(*Id.* at 5.)  Henry's theory of liability can be summarized as follows.  Emma and Allen were

general partners in RCR, and as general partners, both acknowledged that Henry was owed for

his legal fees.  As general partners, Allen and Emma each were directly liable for the partnership

debts.  Any asset that each individually owned would be subject to Henry's debt, and Henry

came to believe that an interest in ARD was part of their assets post-petition.  Nonetheless,

Henry conceded that neither Allen nor Emma ever discussed with him any post-settlement

business dealings that could be considered a new implied partnership.  (*See id.* at 30 ("My

question to you is, did they discuss with you that it was the Casey family venture?  That's my

question.  Beyond all the things you've already explained.  A.  No.  No.").)  Henry's testimony is

consistent with deposition testimony of David Moss, a former business attorney of the debtor,

that he could not recall Henry ever telling him that he thought that any partnership owned the

debtor's assets.  (*See* 1044 Proceeding, Doc. No. 113-1 at 3.)  Similarly, Derek Markey, a realtor

and Henry's son-in-law, testified at his deposition that he never received information from Henry

or others, when representing potential buyers of the debtor's real property, that Allen or Emma

owned any part of ARD or had authority to sell property owned by ARD.  (1044 Proceeding,

Doc. No. 113-4 at 6.)

The Trustee's point in citing to all of the above deposition testimony is twofold.  First,

the Trustee emphasizes that Allen and Emma's "standard MO" was no different pre-settlement

than post-settlement, meaning that Henry engaged in inequitable conduct by pressing claims in

state court "that could have been brought on behalf of all creditors by the Chapter 7 Trustee"

(1044 Proceeding, Doc. No. 113 at 8) under the terms of the settlement.  Second, the Trustee

asserts that Henry engaged in inequitable conduct across both adversary proceedings by using his own self-interested perceptions of an implied partnership as the basis for Emma owing him directly. Henry, according to the Trustee, elevated his perceptions to the level of an entity supported by evidence based on prior dealings. The latter point, in the Trustee's view, also supports Count 2 and a finding of contempt. "Henry, through multiple Amendments and subsequent supporting Declarations, has alleged an ever-evolving series of 'facts' that the Trustee asserts are set forth in an effort to circumvent the actual truth of the matter and to hide his Act of Contempt. Other than his own, self-serving, somewhat fantasized Declarations, Henry has not produced any evidence whatsoever to prove the facts he has alleged." (*Id.* at 3.)

With respect to Count 3 and alleged overstatements of amounts owed, the Trustee believes that Henry's deposition testimony supports his contentions with respect to the interest charged on the legal billing. During his deposition, Henry testified that the annual interest rate in his legal billing equaled 18%. (1044 Proceeding, Doc. No. 113-3 at 23.) As a result, of the total balance of $1,232,069.07 that Henry asserted in Claim 16, $219,860.68 comes from interest alone. (*Id.*) The Trustee argues that Henry has confirmed the use of an interest rate that violates the statutory limit of 10% as set forth in Tenn. Code Ann. § 47-14-121 and Tennessee Formal Ethics Opinion 82-F-28.

Following the reopening of discovery, Henry also filed a supplemental briefing. Henry's supplemental briefing contains a mix of responses and new arguments. Henry accuses the Trustee of selling property of the debtor "for less than the amount of the secured claims attached to the property. This seems to violate a cardinal rule: Trustees should not sell estate property solely for the benefit of secured creditors. If there is nothing left for the benefit of the unsecured

creditors, the Trustee should abandon the property." (1044 Proceeding, Doc. No. 114 at 1.)

Concerning Count 1 and inequitable conduct, Henry defends his assertion of a new, post-

settlement implied partnership in the Casey family by criticizing the Trustee for preventing him

from elaborating on his assertion in litigation:

> Now, this Trustee has taken several depositions to try to show that Henry
> was wrong in various allegations of his amended complaint. He forgets that
> Henry was describing Casey Family Partnerships in 2016 in pleadings filed with
> the Court [Doc.# 378, ¶3; case no. 14-bk-10745-SDR – Objection to Motion to
> Approve Compromise and Settlement]. In that pleading, Henry described how
> the Caseys operated with several partnerships, in addition to RCR. Henry
> described the same conduct to the Trustee in his recent deposition. [Deposition of
> Henry, p. 61 lines 5-25, p. 62 lines 1-20.] In the 2018 suit, he alleged that Emma
> promised to pay his fees herself, and he saw ARD as a new partnership. In the
> Chancery suit, Henry never had the opportunity to develop his theory, to do
> discovery, or to establish his case because of the barrage of actions filed against
> him by the Trustee [Doc.# 3; 18-ap-01029-SDR (Motion to Intervene filed
> 8/14/18): Doc.#89; 18-ap-01029-SDR (Answer Counter-Complaint by Jerrold D.
> Farinash Trustee/Intervenor filed 7/12/19): Doc.#1; 18-ap-01044-SDR
> (Complaint filed 10/23/18): Doc.#1; 19-ap-01037-SDR (Complaint filed
> 7/12/19)]. This plus the fact that Henry was quickly dismissing party defendants.
> Emma and Allen both died, and the Chancery suit now is basically an empty shell.

(*Id.* at 3.) Building on his theory of post-settlement implied partnership, and countering a point

made by the Trustee, Henry argues that the Trustee lacks standing to maintain the claim raised in

state court because that claim arose post-settlement and thus is not part of the bankruptcy estate.

Henry argues that any cause of action concerning slander of title similarly does not belong to the

Trustee but rather to ARD. With respect to Count 2 and contempt, Henry attacks the elements of

contempt by highlighting what he believes are ambiguities in the settlement order of November

7, 2016:

> Henry knew of the settlement order but denies he violated it. He
> especially notes two inconsistencies with it that cause it to be vague and
> unspecific. First, the motion purports to settle all claims, even direct ones, that
> creditors may have against the Casey Creditors. The estate had no rights in such
> direct claims, and the settlement could not act to release them. Second, what

23

> rights do creditors possess against the Caseys under §§ 541, 542, 544, 547, 548,
> 549 and 550 of the Code, as the motion states?  Nothing comes to mind, but what
> does that mean?  The Trustee is for sure saying in this suit that based on his
> motion, any creditor bringing a direct action against the Caseys is in contempt.
> Henry would say that no, the Motion/Order are too broad or indeterminate, and
> civil contempt cannot be maintained on such an order.

(*Id.* at 8–9.)  In short, the current theory that Henry asserts is that his state-court lawsuit was his

effort to enforce Emma's verbal guaranty of his fees.

With respect to Count 3 and legal fees, Henry argues that state law actually supports the

fixed rate of interest stated in the cover page of each billing statement.  Additionally, Henry

questions the Trustee's consistency to the extent that the Trustee settled a lien from David Moss

that was junior to Henry's lien.  That lien featured the same interest rate and the same language

in a deed of trust that recognized that amounts incurred for legal fees could be advances.  "[T]he

Debtor clearly recognized that the 'advances' were for legal fees since it scheduled Henry's

claim as secured in the amount of $1,215,762.81, and it was not listed as contingent,

unliquidated, or disputed when it filed its Petition."  (*Id.* at 11.)

### E. *Henry's Motion in the 1029 Proceeding*

The motion for summary judgment that Henry filed in the 1029 Proceeding contains two

new issues and several similar issues compared to his motion in the 1044 Proceeding.  Henry

seeks summary judgment on the counterclaim for slander of title to Emma's personal residence

and for violation of court orders.  The first new issue concerns the identity of the proper party.

After Emma died on May 15, 2020, the Court on March 11, 2021 granted a motion to substitute

Emma's estate as a defendant and counterclaimant.  (1029 Proceeding, Doc. No. 162.)  Although

Henry never objected to the motion to substitute at the time, he now argues that the estate itself

cannot be the proper party.  Under state law, according to Henry, one or more authorized

24

representatives of the estate must be named as the proper parties.  "Henry maintains that they

must be substituted as the real parties in interest prior to trial, and they need to show their

consent to continue this action on the record.  It would be pointless to grant relief to Emma's

Estate, a non-entity."  (1029 Proceeding, Doc. No. 178 at 5.)  The second new issue concerns

judicial privilege.  Citing to *Desgranges v. Meyer*, No. E2003-02006-COA-R3CV, 2004 WL

1056603 (Tenn. Ct. App. May 11, 2004), Henry argues that he recorded his lis pendens only in

conjunction with the action that he filed in state court.  The state-court action, having become the

1029 Proceeding, remains pending, even after Henry removed the lis pendens.  Consequently,

according to Henry, the filing and the contents of the lis pendens were part of a judicial

proceeding and thus are absolutely privileged from any suit for slander of title or other

defamatory claim.

      As for issues similar to those in the 1044 Proceeding, Henry argues here that the

counterclaim for slander of title now is moot.  When Henry sued Emma and other Casey family

members concerning the real property that the debtor sold to ARD on February 9, 2018, Emma

counterclaimed that Henry slandered title to her personal residence by including it in his lis

pendens, even though it had nothing to do with the collateral securing his promissory note.

Henry argues that Emma's residence since has been conveyed to another family member,

Elizabeth Casey, by quitclaim deed.  "In as much as these transfers occurred of record in

November 2020 and January 2021, Emma's estate no longer has an interest in the Real Property.

For an action of Slander of Title to be maintained, the proponent must maintain an interest in the

property throughout the litigation."  (1029 Proceeding, Doc. No. 178 at 6.)  "Further, the Real

Property was not for sale during the time the lien lis pendens was on it, and Emma suffered no

pecuniary loss as a result.  Henry published no false statements concerning the house, and there

was no malice.  He was trying to collect a legitimate debt, and Allen Casey had told him that he

had an equitable interest in the Real Property." (*Id.* at 7.)  Additionally, and just as in the 1044

Proceeding, Henry argues that he cannot be held in contempt of the November 7, 2016

settlement order because it "bound the Trustee and all creditors from suing Emma for implied

partnership **with RCR**.  It did not address her pre-petition or post-petition implied partnerships

with Allen in their various ventures." (*Id.* at 9.)  Henry argues further that his state-court action

did not involve property of the RCR bankruptcy estate and that his "Chancery court action did

not claim that American River Development, LLC ('ARD') bought the property from the Trustee

with an equitable lien attached to it, nor did he try to duplicate the Emma-ARD implied

partnership cause of action.  He only mentioned it factually in the complaint in order to provide

the context for his right to try to collect his claim from Allen and Emma, who were non-debtors."

(*Id.* at 10.)

Emma's estate opposes Henry's motion in all respects.  With respect to who the proper

party is, Emma's estate notes that Henry never objected to the motion to substitute and that the

state statutes that Henry has cited do not apply here.  In the alternative, Emma's estate proposes

the simple remedy of substituting the personal representatives of the estate as named parties.

Emma's estate argues that it did incur damages resulting from Henry's lis pendens, the

supporting the counterclaim for slander of title, and that the "transfer of the real estate did not

equate to, or cause, a transfer of the cause of action. Emma's Estate has incurred fees, court costs

and other expenses as a direct result of Henry's claims." (1029 Proceeding, Doc. No. 185 at 5.)

Finally, Emma's estate argues that Henry has violated the November 7, 2016 settlement order

because the real property sold on February 9, 2018 was supposed to be sold free and clear.

Henry violated the order, in the estate's view, without any evidence of a new, post-settlement

implied partnership in the Casey family; he relied instead on "a series of assumptions,

speculation and rumors." (*Id.*)

Notably, Emma's estate did not respond to Henry's argument about absolute privilege

protecting his lis pendens. In a one-line conclusory statement that almost looks incomplete from

an editing error, Emma's estate asserted that "the claim of judicial privilege has no application."

(1029 Proceeding, Doc. No. 185 at 5.)

## III.    DISCUSSION

### A.    *Summary Judgment Generally*

Federal Bankruptcy Rule 7056 incorporates Federal Civil Rule 56. The standard for

summary judgment under Rule 56 is well known. "The court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the

substantive law will identify which facts are material. Only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment . . . . More important for present purposes, summary judgment will not lie if the dispute

about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986) (citation omitted). "At the summary judgment stage, the moving party bears the initial

burden of identifying those parts of the record which demonstrate the absence of any genuine

issue of material fact. However, if the moving party seeks summary judgment on an issue for

which it does not bear the burden of proof at trial, the moving party may meet its initial burden

27

by showing that there is an absence of evidence to support the nonmoving party's case. When

the moving party has carried forward this burden, its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts." *White v. Baxter Healthcare

Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008) (internal quotation marks and citations omitted).

"In evaluating the evidence, the court must draw all inferences in the light most favorable to the

non-moving party." *Id.* (citation omitted).

### B. *1044 Proceeding, Plaintiff's Motion for Partial Summary Judgment*

Henry does not dispute that the Trustee's settlement resulted in the avoidance of a portion

of the Casey Creditors' lien for $5,575,000. The parties agree that the lien allowed was for

$3,575,000 in the Settlement Order; the dispute arises in what the status should be of the

remaining $2,024,889. The Settlement Order provided that the liens were avoided under 11

U.S.C. §§ 541, 542, 544, 547, 548, 549, 550, and 551 and preserved for the benefit of the estate.

(Mian Case Doc. No. 374 at 3; Doc. No. 393.) Although the Trustee recited these statutory

provisions in his motion to compromise, his theories to justify avoiding the Casey Creditors'

liens were equitable subordination, recharacterization, and implied partnership. (Main Case Doc.

374 at 2.) The parties do not dispute that the avoided portion was preserved for the benefit of the

estate, but they do dispute whether that benefit left the estate's portion prior in interest to

Henry's lien.

"Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title,

or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but

only with respect to property of the estate." 11 U.S.C. § 551. The preservation is automatic and

takes effect immediately. *See Suhar v. Burns (In re Burns)*, 322 F.3d 421, 428 (6th Cir. 2003)

(Section 551 took effect "immediately upon avoidance of the transfer" in question). "If an entity

28

other than the estate holds an interest in property that is subject to a senior interest, the

preservation of the avoided senior interest will typically benefit the estate.  The principal reason

for the preservation of avoided liens, therefore, is to prevent junior lienors from improving their

position at the expense of the estate when a senior lien is avoided."  5 Collier on Bankruptcy

§ 551.01 (16th ed. and Supp. 2022) (internal quotation marks and citations omitted).

By the same token, the Trustee takes the lien in the condition in which he acquires it.  If

the lien had been unperfected, and if the basis for his avoidance were a state law that would have

given priority to a junior lien holder, then his lien might be preserved but might not retain any

priority.  "While intended to prevent the windfall to junior lienors, section 551 provides no basis

for the promotion of the avoided lien or judgment to an exalted position.  Section 551 has

substantial inherent limitations."  John C. Chobot, *Preserving Liens Avoided in Bankruptcy-*

*Limitations and Applications*, 62 Am. Bankr. L.J. 149, 150 (1988) (internal quotation marks and

citation omitted).

Judge Parsons, in *Fugate v. Equity One, Inc. (In re Graybeal)*, No. 06-5008, 2006 WL

2401096 (Bankr. E.D. Tenn. Aug. 17, 2006), reviewed the cases in which a trustee successfully

avoided a lien under 11 U.S.C. § 544 only to find that the lien preserved was subordinate to a

junior creditor.  In *Walker v. Elam (In re Fowler)*, 201 B.R. 771 (Bankr. E.D. Tenn. 1996), the

lien was avoided because the deed and the deed of trust were recorded post-petition, and the

trustee assumed the status of a judicial lien creditor.  In *Barnett Bank, N.A. v. Weitzner (In re*

*Kavolchyck)*, 164 B.R. 1018 (S.D. Fla. 1994), a creditor's lien was avoided under Section 544

because security interests in leasehold estates cannot be perfected under Florida's Uniform

Commercial Code.  Because the recording was ineffective under state law against another validly

perfected creditor in the case, the trustee's lien was ineffective.  The trustee's preserved lien

faced the same loss of priority in other cases as well.  *Cf. Carvell v. Bank One, N.A. (In re*

*Carvell)*, 222 B.R. 178, 180 (B.A.P. 1st Cir. 1998) ("[Section 551] merely states that a lien

avoided under section 544 (and the other enumerated sections) is 'preserved for the benefit of the

estate . . . .'  Preservation is just that.  It simply puts the estate in the shoes of the creditor whose

lien is avoided.  It does nothing to enhance (or detract from) the rights of that creditor viz-a-viz

other creditors."); *Connelly v. Marine Midland Bank, N.A.*, 61 B.R. 748, 750 (W.D.N.Y. 1986)

("[P]reservation alone does not enhance the status of the trustee's lien so that if the avoided liens

would have been defeated by the junior claimants while in the hands of the lienholders, they are

also vulnerable in trustee's.") (internal quotation and editorial marks and citations omitted); *In re*

*Appalachian Energy Indus., Inc.*, 25 B.R. 515 (Bankr. M.D. Tenn. 1982) (lien of purchase

money secured lender who filed late and lost priority to pre-existing blanket lender).  Henry also

cites *Skumpija v. Warren (In re Skumpija)*, Nos. 11-00338-8-SWH, 13-00159-8-SWH-AP, 2013

WL 6092156 (Bankr. E.D.N.C. Nov. 19, 2013).  In that case, the priority of the preserved lien

arose in the context of a sale motion to determine whether there was equity in property for the

estate or whether the preserved lien had no value to the estate.  The trustee avoided the lien under

Section 544 on the basis that the avoided deed of trust failed to identify or to describe the debt

obligation.  *Id.* at *4.  The court found that the defective deed of trust could not be reformed

because of the existence of an intervening creditor.  *Id.* at *5.  The trustee's preserved lien was

determined to be subordinate to that of the intervening creditor.

When applying the reasoning of the above cases to the situation here, the Court does not

find that the Trustee ever alleged any such imperfection in the Casey Creditors' liens.  Henry

does not contend that he could defeat them on the basis of inadequate acknowledgments, inadequate descriptions, or some failure to record.  There is no dispute that the Casey Creditor liens were recorded and that Henry had actual knowledge of their existence.  Henry even recommended that the liens be documented through direct loans to the debtor.  (*See* Doc. No. 113-3 at 5.)  The facts in those cases are distinguishable from this case, where the creditor is asking the Court to find that an allegation that equitable remedies are appropriate is sufficient to subordinate the Trustee's preserved lien.

In *Graybeal*, Judge Parsons also discussed a line of cases in which the trustee avoided liens where creditors in first position mistakenly released their liens.  In those cases, each court found that reformation was available to reinstate the lien and that the subordinate creditor had knowledge of the lien.  The subordinate creditor's liens thus remained subordinate to the trustee's preserved lien.  *See Graybeal*, 2006 WL 2401096, at *5; *see also First Am. Nat'l Bank v. Miller (In re Miller)*, 286 B.R. 334 (Bankr. E.D. Tenn. 1999); *Terlecky v. Am. Cmty. Bank (In re Godwin)*, 217 B.R. 540 (Bankr. S.D. Ohio 1997); *In re Price*, 97 B.R.264 (Bankr. E.D.N.C. 1989).  These cases help the Court determine whether Henry could have subordinated the liens of the Casey Creditors to his lien under state law.  Unlike Judge Parsons's recognition of reformation where there was no issue of the existence of a mistake, Henry cites no statutory or other authority that always makes an advance of money an equity contribution if it comes from a family member of the party controlling the entity.  In fact, under bankruptcy case law, such recharacterization is an equitable remedy allowed by 11 U.S.C. § 105 and requires the analysis of 11 factors.  *AutoStyle Plastics,* 269 F.3d at 750 (citations omitted).  The difficulty of re-characterizing a claim from debt to equity provides a basis for the Trustee to decide to settle.

Unlike many of the cases on which Henry relies, there is no judgment, or even a stipulation, that

the loans were "a disguised partnership control device created for no consideration"; or that the

*AutoStyle Plastics* factors were met to allow recharacterization.  There were only allegations that

brought about a settlement, which expressly included preservation of the lien.  *Cf., e.g.,*

*Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 544 (5th Cir. 2011)

(affirming recharacterization of debt as equity, where bankruptcy court held a hearing and made

findings of fact and conclusions of law); *In re Deer Valley Trucking, Inc.*, 569 B.R. 341, 349

(Bankr. D. Idaho 2017) (declining to reclassify a loan as equity after conducting an evidentiary

hearing).  The only finding that the Court was required to make at the time of the settlement was

whether the settlement was "fair, equitable and in the best interest of the Estate and its creditors."

(Main Case, Doc. No. 374 at 5.)  In the absence of any settlement terms or judicial findings that

would require a different result, the Trustee holds an interest superior to Henry's lien because he

> acquired his interest in his capacity as the representative of debtor's estate
> pursuant to a court approved compromise and settlement.  As such, it is preserved
> pursuant to that court approved settlement for the benefit of the estate.  While 11
> U.S.C. § 551 provides for the automatic preservation for the benefit of the estate
> of avoided transfers or liens, it does not prohibit the same result by consensual
> resolution of such issues.

*Goger v. Merchants Bank of Atlanta (In re Feifer Indus., Inc.)*, 155 B.R. 256, 260 (Bankr. N.D.

Ga. 1993).

Henry now asks the Court to treat the settlement as though it were a judgment on the

issue of subordination, and then to use that judgment as a basis to find that Henry could have

defeated the lien.  Henry might have been able to bring such an action prior to filing, but he did

not, and this Court will not try that case now.  *Cf. In re Van de Kamp's Dutch Bakeries*, 908 F.2d

517, 519 (9th Cir. 1990) ("Appellants could have brought an action in state court prior to the

commencement of the bankruptcy action to avoid the fraudulent transfer but chose not to do so.

Now they ask this court to determine how such an action would have concluded, and to grant

them a status they might have attained absent the bankruptcy proceedings.  This we cannot do.").

The Court concludes that the lien was preserved for the benefit of the estate and that there

were no findings in the Settlement Order on which Henry may rely to show that his lien is

superior to that of the Casey Creditors.  Such a result does not unduly prejudice Henry, who had

actual knowledge that his lien was recorded after the liens of the Casey Creditors.  Section 551

thus operates, as a matter of law, to maintain the avoided portion of the Casey Creditors' lien as

superior to Henry's lien.

Under the circumstances described above, there is no dispute that the sale proceeds were

less than the total amount of the lien allowed to the Casey Creditors plus the lien preserved for

the estate.  Henry's lien, therefore, is unsecured as a matter of law.  Accordingly, the Court will

grant the Trustee's motion for partial summary judgment.

### C.  1044 Proceeding, Henry's Motion for Summary Judgment

The Court now turns to Henry's motion for summary judgment in the 1044 Proceeding.

Since Henry organized his arguments to address each count of the complaint, the Court will

organize its analysis in the same way.

#### i.    Count 1: Equitable Subordination

Equitable subordination existed before the creation of the Bankruptcy Code, and

Congress preserved it through 11 U.S.C. § 510(c).  Under Section 510(c)(1), the Court may

"under principles of equitable subordination, subordinate for purposes of distribution all or part

of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to

all or part of another allowed interest."  11 U.S.C. § 510(c)(1).  Section 510(c) "was essentially a

33

codification of prior case law with further development of the principles of equitable

subordination left to the courts." 4 Collier on Bankruptcy § 510.05 (16th ed. 2021) (citations

omitted). "The concept of equitable subordination, as developed by case law, is that a claim may

normally be subordinated only if its holder is guilty of some misconduct. It is a remedial, not a

penal, measure that is used only sparingly." *Id.* (citations omitted); *see also, e.g., Bank of N.Y. v.*

*Epic Resorts—Palm Springs Marquis Villas, LLC (In re Epic Cap. Corp.)*, 307 B.R. 767, 773 (D.

Del. 2004) (describing equitable subordination as "an extraordinary remedy which is applied

sparingly") (citations omitted). At trial, the Trustee would bear the burden of establishing the

following three elements of equitable subordination by a preponderance of the evidence: 1) some

type of inequitable conduct; 2) a resulting injury to creditors or an unfair advantage on the

claimant; and 3) no inconsistency between equitable subordination of the claim and other

provisions of the Bankruptcy Code. *First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs.)*,

974 F.2d 712, 718 (6th Cir. 1992) (citations omitted); *accord Hamerly v. Fifth Third Mortg. Co.*

*(In re J & M Salupo Dev. Co.)*, 388 B.R. 795, 804 (B.A.P. 6th Cir. 2008) (citations omitted).

"Satisfaction of this three-part standard does not mean that a court is *required* to equitably

subordinate a claim, but rather that the court is *permitted* to take such action." *Bayer Corp. v.*

*MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744 (6th Cir. 2001) (citation

omitted).

 Compared to the other two elements, determining inequitable conduct is the "critical

inquiry" that warrants the most attention. *Sender v. The Bronze Group, Ltd. (In re Hedged-Invs.*

*Assocs., Inc.)*, 380 F.3d 1292, 1300 (10th Cir. 2004) (citation omitted); *accord Official*

*Committee of Unsecured Creditors of HH Liquidation, LLC v. Comvest Group Holdings, LLC*

34

(*In re HH Liquidation, LLC*), 590 B.R. 211, 299 (Bankr. D. Del. 2018) (citing *Hedged*). "Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." *Id.*; *see also Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991) ("If the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary.") (citation omitted).[5] There is no formula to determine inequitable conduct with precision, "but there have been recognized generally three categories of misconduct which may constitute inequitable conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Fabricators, Inc.*, 926 F.2d at 1467 (citation omitted). The Court does not see that any of these categories of misconduct have occurred here.

A few example cases can provide some sense of what the threshold is for inequitable conduct. A bank's negligent failure to investigate suspicions of fraud by a borrower was not inequitable conduct without a deliberate decision to avoid confirming its suspicion. *Grede v. Bank of N.Y. Mellon Corp. (In re Sentinel Mgmt. Grp., Inc.)*, 809 F.3d 958, 965 (7th Cir. 2016)

---

[5] The Trustee included a paragraph in his responding memorandum of law in which he asserted that Henry was an insider because he provided legal services for the debtor for nearly a decade and because he had a long relationship with the Casey family. (1044 Proceeding, Doc. No. 102 at 2.) The distinction between insider and non-insider matters because insiders defending against equitable subordination face "more exacting scrutiny." *Rafoth*, 974 F.2d at 718. For a corporate debtor, however, the Bankruptcy Code would require Henry to be a director, officer, person in control, or general partner of the debtor, or the relative of one of those people. 11 U.S.C. § 101(31)(B); *see, e.g., Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 732 (11th Cir. 1986) (claimant was an insider after taking control of the debtor and becoming its secretary). The record does not present sufficient evidence to assign Henry insider status, and the Court will proceed with the standard for non-insiders.

(citations omitted).  When a bank failed to fund promissory notes as (allegedly) orally promised, causing a debtor to overextend itself financially, no fraud occurred because the bank made no misrepresentations to third parties about additional financing and was not a fiduciary of the debtor.  *Holt v. FDIC (Matter of CTS Truss, Inc.)*, 868 F.2d 146, 149 (5th Cir. 1989).  A creditor was permitted to monitor the debtor's finances closely, to discourage the sale of equity interests to other creditors, and to plan possible remedies to enforce its security agreement in the event of a default, all without being considered to have fraudulently induced the debtor to forego opportunities with other parties for debt and equity financing.  *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 173 (Bankr. E.D.N.Y. 1983).  In contrast, inequitable conduct was found in a pre-Code case where a corporate officer asserted a claim for back pay, caused his company to confess a judgment in his favor, executed the judgment, and then transferred the resulting proceeds to a new corporate entity that he created for himself—all to thwart a creditor from executing a judgment for royalties due under a lease.  *Pepper v. Litton*, 308 U.S. 295, 311 (1939).  Equitable subordination was necessary where a fiduciary and part owner used inside information to purchase claims against its own company, the debtor, for its own profit and to influence the debtor's reorganization in its own self-interest.  *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998).  A mortgage lender's secured claim was equitably subordinated to punish egregious behavior, where the lender made numerous angry and threatening calls to the debtors despite the automatic stay and told the debtors that it "did not care" that they had filed a bankruptcy petition.  *In re Kortz*, 283 B.R. 706, 714 (Bankr. N.D. Ohio 2002).  A bank's lien was equitably subordinated, where the bank fraudulently induced the holder of a senior mechanic's lien against the debtor to

36

sign a document with a subordination clause buried in it. *Sepco, Inc. v. Valley State Bank (In re Sepco, Inc.)*, 36 B.R. 279, 286 (Bankr. D.S.D. 1984). Finally, the claim of a corporate officer was equitably subordinated, where the corporation was severely undercapitalized, the corporate officer had no documentation of a loan that he supposedly made to the company, and the officer nonetheless tried to maneuver as an insider to have his claim paid ahead of the claims of other creditors. *In re Sterling House, Inc.*, 356 F. Supp. 1113, 1116 (W.D. Va. 1973).

The frame of reference that comes from the above cases shows that Henry's conduct here does not approach the threshold of inequitable conduct. Henry was not an insider and did not use any private information of the debtor to try to slip ahead of senior liens. The Trustee has not alleged that Henry fraudulently induced anyone to do anything. The Trustee's factual predicate for his request is that the filing of Henry's lawsuit was an act of contempt that should be sanctioned by subordination..

In fact, the Trustee's factual allegations against Henry boil down to the basis of Henry's theory of Emma's liability to him. Henry crafted his belief that Emma was a partner in RCR based on how he observed money in the Casey family flow from Emma to Allen to the debtor. Henry conceded at his deposition that he had no basis for his theory apart from his personal observations. Going as far as to give his personal observations a formal name—"Casey Family Partnership"—and then naming that creation as a defendant in the 1029 Proceeding was unusual, considering that no court had confirmed the existence of the implied partnership. Henry also acknowledged that the primary motive for his theory was to litigate without violating the November 7, 2016 settlement order. Implied in that motive, however, was a respect for the settlement order and the desire to find a legitimate litigation strategy that would not violate it.

37

Henry's theory might fail on substance, but conceptually, there would have been nothing wrong with his litigation in state court if he had initially pled only that Emma was liable to him because she assured him that she would pay him.  Instead, Henry repeatedly relied on Emma's pre-settlement financial transactions with her husband to declare that she was a partner with Allen and to establish her liability to him directly.  The reliance on a pre-settlement course of conduct gives the Trustee some evidence that Henry was making an end run around the Settlement Order. Henry now has refined his argument to allege that Emma assured him that he would be paid and, therefore, he could proceed against her directly.  "That a party in litigation chooses to seek a decision on the merits as opposed to settle the case does not alone establish bad faith or necessarily reflect an illegitimate litigation strategy." *District of Columbia v. Straus*, 705 F. Supp. 2d 14, 16–17 (D.D.C. 2010) (school district's "zealous, if misguided, advocacy" against student with special educational needs did not justify award of attorney fees); *see also, e.g., Effective Expl., LLC v. BlueStone Nat. Res. II, LLC*, No. 216CV00607JRGRSP, 2018 WL 466246, at *2 (E.D. Tex. Jan. 18, 2018) (plaintiff in a patent infringement case not assessed attorney fees and sanctions, where its position was "weak, but not exceptionally so" and led to summary judgment for defendant).

Under these circumstances, no reasonable factfinder would conclude that Henry, in pursuing the state-court litigation that became the 1029 Proceeding, acted in a way that would require a legal conclusion of such inequitable conduct in obtaining his lien or acting as a creditor that his lien should be equitably subordinated.  Without inequitable conduct worthy of subordination, Count 1 fails without the need to assess the remaining elements of equitable

38

subordination.  Consequently, the Court will grant Henry's motion with respect to Count 1 of the

complaint in the 1044 Proceeding.

> ii.    *Count 2: Contempt*

The Court turns next to Count 2 of the Trustee's complaint.  A court may hold a creditor

in civil contempt for violating one or more of its orders when there is no "fair ground of doubt"

as to whether the creditor's conduct might be lawful under those orders.  *See Taggart v.*

*Lorenzen*, ___ U.S. ___, 139 S. Ct. 1795, 1804 (2019).  "It is not enough to show that the

creditor was aware of the [prior] order and intended its actions that violated the order.  The

aggrieved debtor must show by clear and convincing evidence that the creditor had no

objectively reasonable basis to conclude that its conduct might be lawful.  In a civil contempt

proceeding, three elements must be established: (1) the alleged contemnor had knowledge of the

order which he is said to have violated; (2) the alleged contemnor did in fact violate the order;

and (3) the order violated must have been specific and definite."  *In re Berry*, No. 11-28881-L,

2021 WL 2010777, at *5 (Bankr. W.D. Tenn. Mar. 9, 2021) (internal quotation marks and

citations omitted); *see also Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir.

2017) ("The burden of showing that an order is definite and specific is heavy.").  A finding of

civil contempt must occur by clear and convincing evidence.  *Glover v. Johnson*, 138 F.3d 229,

244 (6th Cir. 1998).

The Trustee has identified the two orders that Henry allegedly violated: the agreed order

of February 26, 2016 in which Henry consented to a real property sale that would include the

collateral securing his promissory note (Main Case, Doc. No. 308); and the order of November

21, 2017 authorizing the sale of the collateral (Main Case, Doc. No. 443).  Neither of those

orders contained any injunction or other directive that "[a]ll persons and entities holding liens,

39

claims, encumbrances or interests in or against the property or in any way relating to the property are hereby forever barred, estopped and permanently enjoined from asserting against the property and [the buyer], such persons' or entities' liens, claims, encumbrances or interests in and to the Property." *Heaney v. Lamento (In re Whiz Kids Dev., LLC)*, 576 B.R. 731, 739 (Bankr. D. Mass. 2017) (unsuccessful bidder for property found in contempt of sale injunction by commencing post-settlement litigation and by smearing the property developers through internet postings). The Trustee has made no showing that Henry did anything to prevent the February 9, 2018 property sale from occurring. *Cf. Yan Sui v. Marshack (In re Yan Sui)*, No. 8:11-BK-20448-CB, 2017 WL 2492527, at *5 (B.A.P. 9th Cir. June 7, 2017) (affirming sanctions against a *pro se* debtor who threatened the trustee's realtors to thwart a property sale, despite a sale order stating that the debtor could not "assert any lien, claim, or interest in the Property in violation of the free and clear provisions of this order"). The Settlement Order did provide that any claim a creditor had against the Casey Creditors was settled under Sections 544 through 551. If Henry brought his state-court action to prove that the Casey Creditors were liable as RCR's partners, and therefore liable to him, then he violated the Settlement Order. If his action was to enforce a direct liability from Emma to him then there was no contempt. The evolution Henry's theories creates a question of fact as to his intent when he filed the state-court action. Under these ambiguous factual circumstances, the Court will deny Henry's motion with respect to Count 2 of the complaint in the 1044 Proceeding.

### iii.   *Count 3: Amount of Henry's Lien*

Finally, the Court turns to Count 3 of the complaint, which is an objection to Henry's

Claim 16 in the Main Case.[6]  "If a party fails to properly support an assertion of fact or fails to

properly address another party's assertion of fact as required by Rule 56(c), the court may: (1)

give an opportunity to properly support or address the fact; (2) consider the fact undisputed for

purposes of the motion; (3) grant summary judgment if the motion and supporting materials—

including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any

other appropriate order."  Fed. R. Civ. P. 56(e); *see also Harris v. Gen. Motors Corp.*, 201 F.3d

800, 802 (6th Cir. 2000) ("The nonmoving party must identify specific facts, supported by

evidence, and may not rely on mere allegations contained in the pleadings.") (citations omitted);

*Pavlovich v. Nat'l City Bank*, 342 F. Supp. 2d 718, 723 (N.D. Ohio 2004) ("The non-moving

party is under an affirmative duty to point out specific facts in the record as it has been

established which create a genuine issue of material fact.") (citation omitted).  Here, the Trustee

originally framed Count 3 in the complaint by attacking Henry's Claim 16 as "overstated in

amount" and "inconceivable."  (1044 Proceeding, Doc. No. 1 at 6.)  The Trustee was skeptical at

the time because of "insufficient documentation attached to Mr. Henry's claim."  (*Id.* at 7.)  No

---

[6] The Trustee never filed a separate objection to the claim in the Main Case, but the objection is properly
included in this adversary proceeding under Bankruptcy Rule 3007(b), even if the other counts of the
complaint fail.  *See also Moi v. Asset Acceptance LLC (In re Moi)*, 381 B.R. 770, 772 (Bankr. S.D. Cal.
2008) ("At its core, however, an adversary proceeding is just a procedure and does not, of itself, give rise
to some broader array of causes of action or remedies.  In the instant case, a claim objection is still a
claim objection, whether raised by filed objection or by adversary."); *Giuliano v. U.S. Nursing Corp. (In
re Lexington Healthcare Grp., Inc.)*, 339 B.R. 570, 578 (Bankr. D. Del. 2006) ("The fact that adding a
claim under Rule 7001 to an objection to a claim requires all be heard as an adversary proceeding does
not mean that an objection to a claim alone cannot be heard as an adversary proceeding [if all other counts
are dismissed].").

later than December 4, 2020, however, the Trustee had Henry's complete itemized billing and could have formed specific objections to specific line items.  (1029 Proceeding, Doc. No. 152 at 16–112.)  The Trustee could have incorporated any specific objections into his memorandum of law opposing Henry's motion, which was filed months later on July 26, 2021.  The Trustee also could have asked questions that Henry's deposition about specific line items and whether Henry could justify the charges for those line items.  Any deposition testimony about specific line items then could have been quoted in the Trustee's supplemental memorandum of law of September 20, 2021.  Instead, the Trustee did not cite to any specific line items in either memorandum of law.  The first memorandum of law contained the Trustee's continued general sentiment that the size of Henry's Claim 16 was "inconceivable."  (1044 Proceeding, Doc. No. 102 at 4.)  Both memoranda of law suggest that Henry might have charged interest in his legal billing that exceeded the maximum interest rates permitted by state law and by state attorney ethics opinions (*id.*; 1044 Proceeding, Doc. No. 113 at 9); in neither document, however, did the Trustee calculate a specific amount of Henry's legal billing that should be discounted under specific state statutes or ethics rules.

Under these circumstances, invoking Rule 56(e) will be necessary to allow the Court to consider the Trustee's objection following a more fully developed argument:

> Effectively searching the record for "genuine issues" requires time, of course, but it also requires an adroit knowledge of the core issues of proof in the case along with an ability to recognize how various threads of testimony, woven together, could possibly defeat a dispositive motion.  It is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome.  Thus, the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not.  And then, as to the element of time—if our trial courts could conjure up things for

42

themselves, we believe that "more time" would be high on most lists.  Conjuring, though, still lies beyond grasp.  To try to review the complete collection of exhibits, or to read each line of every page of all submitted depositions—much of which may not even be relevant to the real issues at hand—this represents to courts at both the trial and appellate levels an unrealistic ideal, an unaffordable luxury.

Additionally, it seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion.  Such a role would carry the court far beyond simply reviewing evidence in "the light most favorable to the non-moving party," or giving effect to inferences reasonably arising from the designated evidence.  For these and other entirely sound reasons, the Rule requires the non-moving party to do its own work, and to assist the trial court by responding to the motion, pointing out as specifically as is reasonably possible facts that might demonstrate the existence of genuine issues.

*Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 406 (6th Cir. 1992).  Rule 56(e)(1) seems the best provision to invoke given the volume of material in the record that might support a genuine issue of material fact.  *Cf. Zayler v. Miken Oil, Inc. (In re Slamdunk Enterprises, Inc.)*, No. 17-60566, 2021 WL 389081, at *24 (Bankr. E.D. Tex. Jan. 29, 2021) (invoking Rule 56(e)(1) to allow a supplemental exhibit in an avoidance proceeding).  The Trustee will have 14 days from entry of this Memorandum Opinion to file a supplemental memorandum of law that identifies which specific line items in Henry's legal billing should be disallowed and why. Henry will have 14 days after the Trustee's filing to respond.  The Court will provisionally grant Henry's motion with respect to Count 3 but will revisit this portion of the motion after receiving the supplemental filings.

### D.  1029 Proceeding, Henry's Motion for Summary Judgment

The Court now turns to Henry's motion in the 1029 Proceeding for summary judgment on the counterclaim against him for slander of title of Emma's personal residence and for violation of court orders.

43

i.   *Proper Party to Maintain the Counterclaim*

The Court's first will address Henry's argument that Emma's estate is not the proper

party to maintain the counterclaim.  Bankruptcy Rule 7025 made Civil Rule 25 applicable when

Emma died.  "If a party dies and the claim is not extinguished, the court may order substitution

of the proper party.  A motion for substitution may be made by any party or by the decedent's

successor or representative."  Fed. R. Civ. P. 25(a)(1).  Civil Rule 25 does not affect substantive

rights; it is procedural only.[7]  "The 'successors or representatives of the deceased party'

contemplated by the rule are those empowered to assert any legal claims of the decedent not

extinguished by death, or to defend the estate against others' claims."  *Fariss v. Lynchburg*

*Foundry*, 769 F.2d 958, 962 (4th Cir. 1985).  Here, the motion for substitution identified Lynn

Patten Casey, Elizabeth Patten Casey, and Z. Cartter Patten as the co-executors of Emma's estate

as appointed by the Hamilton County Chancery Court.  (1029 Proceeding, Doc. No. 158 at 2.)

The motion further clarified that the co-executors authorized the request to substitute Emma's

estate for Emma.  (*Id.*)  While naming an individual executor appears to be the more common

practice, case law suggests that naming the estate itself is not forbidden as long as duly appointed

executors clearly are authorizing the actions of counsel.  *See Barlow v. Ground*, 39 F.3d 231, 232

(9th Cir. 1994) (referring to arguments made by an estate and not an individual); *McKenna v.*

*Pac. Rail Serv.*, 32 F.3d 820, 836 (3d Cir. 1994) (describing how Civil Rule 25 requires an

executor to move for "substitution of the estate for the deceased"); *Haynes v. R.H. Dyck, Inc.*,

No. 206CV-02944-MCE-EFB, 2007 WL 3010574, at *2 (E.D. Cal. Oct. 15, 2007) ("Although

---

[7] To the extent that Henry has cited state law in support of his argument, the Court notes that "the Federal rules, rather than state-law principles, govern the procedure for substitution following a party's death, even where the court must apply state substantive law."  *Servidone Const. Corp. v. Levine*, 156 F.3d 414, 416 (2d Cir. 1998) (citations omitted).

perhaps it may have been more prudent to substitute the representatives of the Estate rather than the Estate itself, absent clear law on the issue, this Court finds insufficient grounds to deny the motion [to substitute] based solely on Defendants' argument that the Motion for Substitution names the Estate as the party to be substituted."). Consequently, the substitution of Emma's estate for Emma herself was proper. The Court thus will deny this part of Henry's motion but without prejudice to an appropriate motion that establishes that naming one or more of the co-executors by name would provide greater clarity and would assist in resolving the counterclaim.

### ii.    Violation of Court Orders

For the portion of the counterclaim addressing violations of prior orders, the Court, for the sake of brevity, will incorporate by reference the analysis that it explained above for Henry's motion in the 1044 Proceeding. In short, Henry devised his theory of post-settlement implied partnership based on his observations of how members of the Casey family managed their finances pre-settlement. The theory ultimately did not work because Henry had no evidence other than his observations, but the Trustee in the 1044 Proceeding attempted a similar theory, and if Henry had produced more evidence of a direct obligation from Casey Family members to him then the theory might have been a cognizable theory that clearly respected the Henry Sale Order and the Trustee Sale Order. That is Henry's current position, but it is contrary to his prior pleadings on which the Trustee relies. The record indicates that there is a question of fact regarding Henry's intent when he filed the state-court action. The Court thus will deny this part of Henry's motion.

### iii.    Slander of Title

Finally, the Court will address slander of title. Tennessee has recognized a tort claim for falsehoods injurious to title since 1911. *See Phillips v. Woods*, No. E200700697COAR3CV, 2008 WL 836161, at *7 (Tenn. Ct. App. Mar. 31, 2008) (citation omitted); *see also id.* at *6 n.4

45

(describing libel of title and slander of title as equal "species of a claim for 'injurious

falsehood'") (citing *Wagner v. Fleming*, 139 S.W.3d 295, 301–02 (Tenn. Ct. App. 2004)).  "To

establish slander of title in Tennessee, a plaintiff must prove: (1) that she has an interest in the

property, (2) that the defendant published false statements about the title to the property, (3) that

the defendant was acting maliciously, and (4) that the false statements proximately caused the

plaintiff a pecuniary loss."  *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 754 (6th Cir. 2014)

(citing *Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999)).

        Of all the issues, however, that the parties have raised concerning slander of title, the

issue of judicial privilege draws the Court's immediate attention.  "In most, if not all, American

jurisdictions—including Tennessee—statements made in the course of judicial proceedings

which are relevant and pertinent to the issues are absolutely privileged, and therefore cannot be

used as a basis for a libel action for damages.  This is true even if the statements are known to be

false or even malicious."  *Desgranges v. Meyer*, No. E2003-02006-COA-R3CV, 2004 WL

1056603, at *5 (Tenn. Ct. App. May 11, 2004) (internal quotation marks omitted) (citing *Jones

v. Trice*, 360 S.W.2d 48, 50 (Tenn. 1962)).  Absolute judicial privilege covers statements

included in a lien filed as a prerequisite to litigation to enforce the lien.  *Id.* at *9 ("Libel of title

actions pertain to injurious statements regarding real property.  It is clear that disparaging

statements in legal proceedings are only one species of such injurious activity.  However, when

such statements, even if false, are made in a legal proceeding, the concept of absolute privilege

comes into play and operates as a total bar to a libel of title action based upon those

statements."); *cf. Pulte Homes Tennessee Ltd. P'ship v. PBG of S.C., Inc.*, No. 3:17-CV-1218,

2018 WL 1378536, at *3 (M.D. Tenn. Mar. 19, 2018) (absolute privilege did not protect a

46

contractor's lien from a claim for slander of title, where the contractor never filed suit or

otherwise took action to enforce the lien); *Phillips*, 2008 WL 836161, at *10 ("[W]e find that the

filing of [a fraudulent deed to a disputed driveway] was not a part of a judicial proceeding so as

to clothe the statements made in the deed with absolute immunity from suit for libel of title.").

The lien in *Desgranges* was a mechanics' lien filed under Chapter 11 of Title 66 of Tennessee

Code Annotated, but the principle of absolute judicial privilege discussed in that case and in

*Jones* is broad enough to cover the lien that Henry filed—a lis pendens recorded under Tenn.

Code Ann. § 20-3-101(a).[8]  Applying absolute judicial privilege to a lis pendens filed with

related litigation is consistent with how other jurisdictions have addressed the same issue.[9]  *See,*

*e.g., Manders v. Manders*, 897 F. Supp. 972, 978 (S.D. Tex. 1995) (filing of a lis pendens was

absolutely privileged against claims for slander of title and tortious interference with contract);

*see also* 50 Am. Jur. 2d *Libel and Slander* § 520 (Westlaw and 2022 Supp.) (collecting cases);

*Lis pendens*, 13 Bus. & Com. Litig. Fed. Cts. § 148:25 (5th ed. and 2021 Supp.) (collecting

cases).  Additionally, Henry's decision to release his lis pendens while litigation continued does

not change the privilege that attached to the initial filing.  The privilege would have continued

even in an inverse scenario in which Henry did not release his lis pendens even after his

litigation was dismissed.  *Cf. Reed v. Rescap Borrower Claims Trust (In re Residential Cap.,*

---

[8] As Henry has noted, the only provision that appeared to influence the scope of absolute judicial privilege in Tennessee was a statute in Title 66 that was in effect from May 21, 2018 to April 5, 2019 and that allowed a real property owner prevailing in a slander of title proceeding to recover damages, costs, and fees.  Tenn. Code Ann. § 66-21-108 (West 2019), *repealed by* 2019 Tenn. Laws Pub. Ch. 142 (H.B. 757) (Apr. 5, 2019).

[9] For the sake of completeness, the Court notes one case in which a claim for libel of title was dismissed on substantive grounds, apparently without any party even raising the issue of absolute judicial privilege. *See generally Blasingame v. Church Joint Venture, L.P.*, No. 15-1038, 2015 WL 4758933 (W.D. Tenn. Aug. 12, 2015).

*LLC*), 552 B.R. 50, 67–68 (S.D.N.Y. 2015) ("Having determined that [the lender's] original

recording of the *lis pendens* was privileged, I must briefly consider whether the privilege ceased

after the Foreclosure Action was dismissed and [the lender] failed to discharge the *lis pendens*.

It did not.").

 Applying the above principles to this adversary proceeding gives the Court guidance as to

the outcome of Henry's motion.  Henry recorded his lis pendens and filed his state-court

litigation on the same day—July 13, 2018.  (1029 Proceeding, Doc. Nos. 1-1, 175-1.)  The record

has shown consistently that Henry recorded his lis pendens for no purpose except the litigation

that he filed the same day.  Henry's lis pendens thus is absolutely privileged.  Emma's estate has

based its counterclaim entirely on both the act of recording the lis pendens and the contents of

the document.  Without any information outside of the lis pendens to sustain the counterclaim,

and without any authority[10] that would create an exception to the privilege, the counterclaim fails

as a matter of law.  The Court thus will grant Henry's motion with respect to slander of title.

Addressing the individual elements of slander of title will not be necessary.

---

[10] The Court need not address whether some other remedy might have been available.  *See, e.g., Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316, 1330 (3d Cir. 1982) ("We also note that remedies of malicious prosecution and abuse of process are likely to be available in New Jersey to provide some protection against improper utilization of lis pendens.").

## IV.    CONCLUSION

For all of the above reasons, the Court will adjudicate the pending motions as follows:

1)      The Court will grant the Trustee's motion for partial summary judgment in the 1044 Proceeding (1044 Proceeding, Doc. No. 71).  The avoided portion of the lien of the Casey Creditors is preserved for the estate and is prior in interest to Henry's lien.

2)      The Court will grant Henry's motion for summary judgment in the 1044 Proceeding (1044 Proceeding, Doc. No. 82) for Count 1 of the complaint.  The Trustee is not entitled to equitable subordination of Henry's claim as a matter of law.  The Court will deny the motion for Count 2.  Questions of fact exist as to whether Henry had a fair ground of doubt as to whether his filing of the state-court litigation might be lawful.  For Count 3 of the complaint, the Trustee will have 14 days from entry of this Memorandum Opinion to file a supplemental memorandum of law that identifies which specific line items in Henry's legal billing should be disallowed and why.  Henry will have 14 days after the Trustee's filing to respond.  The Court will provisionally grant Henry's motion with respect to Count 3 but will revisit this portion of the motion after receiving the supplemental filings.

3)      The Court will grant Henry's motion for summary judgment in the 1029 Proceeding (1029 Proceeding, Doc. No. 175) with respect to slander of title, and that portion of the counterclaim will be dismissed.  The Court will deny the motion in all other respects.

This Memorandum Opinion will be docketed in each adversary proceeding.  A separate order will follow.

* * *